582 So.2d 1272 (1991)
Georgia Wells Martin, Wife of, and Roger MARTIN
v.
EAST JEFFERSON GENERAL HOSPITAL, Employees of East Jefferson General Hospital, Saeed Ahmed, M.D., and Jesse James Wells, Sr., and Other Joint Tortfeasors and Health Care Providers.
No. 91-C-0393.
Supreme Court of Louisiana.
June 21, 1991.
*1274 Russ M. Herman, Mark B. Wolfe, John B. Loweb, Charles O. Taylor, Herman, Herman, Katz & Cotlar, New Orleans, for plaintiff-applicant.
Steven A. Adams, Carruth, Cooper and Adams, Baton Rouge, Edward Rice, Adams & Reese, New Orleans, for defendant-respondent.
CALOGERO, Chief Justice.
A writ was granted in this medical malpractice action to determine whether the court of appeal, which reversed the district court's judgment in favor of the plaintiff, afforded the proper deference to the district court's findings of fact.
This action arose out of the death of a twenty-one year old woman named Joyce[1] Marie Wells. The immediate cause of her death was cardiac arrest due to myocarditis, an inflammation of the muscular wall of the heart. Ms. Wells' mother, Georgia Wells Martin, brought this lawsuit against the treating physician, Dr. Saeed Ahmed, and several other health care providers, contending that Dr. Ahmed's treatment of Ms. Wells fell below the standard of care ordinarily practiced by doctors of internal medicine. The plaintiff claimed that the myocarditis was likely the result of undiagnosed systemic lupus erythematosus (lupus), a collagen vascular disease which can be treated with steroid drugs. Dr. Ahmed defended on the theory that the myocarditis was caused by a viral infection, which is an untreatable condition.
After a bench trial, the district court entered judgment in favor of the plaintiff in the amount of $150,000.00, later clarifying the judgment to assess $100,000.00 against Dr. Ahmed and $50,000 against the Commissioner of Insurance and the Louisiana Patient's Compensation Fund. In written reasons for judgment, the district judge determined that Ms. Wells probably had lupus, and that the doctor's failure to rule out lupus as the cause of Ms. Wells' chronic illness lessened the patient's chances of survival. Both the doctor and the Fund appealed the judgment to the court of appeal.
The court of appeal reversed, holding that the plaintiff "failed to show by a preponderance of the evidence that, more probably than not, her chances of survival were reduced by defendant's failure to rule out lupus as a possible cause of her last illness." Martin v. East Jefferson General Hospital, 571 So.2d 895, 897 (La.App. 5th Cir.1990). The court of appeal stated that the district judge erred as a matter of law because, in its view, the record did not support a finding that the doctor's treatment, even if it fell below the standard of care, was more likely than not a cause of the patient's death. The court of appeal concluded that "on the evidence presented it is equally plausible that the death resulted from a viral infection as diagnosed by Dr. Ahmed, as it is that she died of complications of lupus." 571 So.2d at 897.
The court of appeal thus reversed the district court upon determining that the plaintiff failed to prove causation. After reviewing the record, we conclude that the court of appeal improperly substituted its own factual findings for that of the district court, thereby misapplying the manifest error/clearly wrong standard of review. Accordingly, we reverse the judgment of the court of appeal and reinstate the judgment of the district court.
The facts of this case show that Ms. Wells was a twenty-one year old woman who prior to the following events had no medical history of chronic illness. On August 18, 1980, she experienced severe pelvic and abdominal pain and was taken to the emergency room of East Jefferson General Hospital where she was treated and released. Five weeks later, on September 24, 1980, Ms. Wells returned to the emergency room suffering from abdominal *1275 discomfort, vomiting, neck pains, lethargy, and a red, itchy rash on her arms and thighs. The emergency room physician diagnosed "viral illness," prescribed aspirin, pain and nausea medication, and released Ms. Wells to return home.
Four days later, on September 28, 1980, Ms. Wells had one, possibly two, grand mal seizures and was again brought to the East Jefferson emergency room. She was found to have fever, lethargy, headache and was "hot to the touch." The emergency room physician made a preliminary diagnosis of viral encephalitis. Ms. Wells was referred by the emergency room to Dr. Saeed Ahmed, the defendant. Dr. Ahmed practiced internal medicine and nephrology but was not board certified in either specialty. He saw Ms. Wells after she had been stabilized, and admitted her to East Jefferson General Hospital. Dr. Ahmed did not obtain a complete medical, social and family history at the time of Ms. Wells' admission, nor at any time during her initial five day stay at the hospital. Dr. Ahmed also failed to review Ms. Wells' records from her August 18th and September 24th visits to East Jefferson General Hospital. Based on her symptoms and her lab tests, Dr. Ahmed concluded that Ms. Wells was suffering from either viral encephalitis or viral meningitis. He prescribed Vibramycin, an antibiotic.
Although Ms. Wells had never before suffered from grand mal seizures, Dr. Ahmed did not consult with a neurologist to investigate the cause of the seizures. Additionally, when Dr. Ahmed received Ms. Wells' lab studies on admission, he failed to repeat any of these tests even though the results revealed significantly elevated levels in the liver and heart enzymes, spinal fluids, blood tests, urinalysis and chemistry profile. The one abnormal study Dr. Ahmed repeated was the EKG showing a first degree AV (atrial ventricular) block. Ms. Wells' subsequent EKG showed a tachycardia (rapid pulse rate) of 135.
During this initial hospitalization, Ms. Wells again broke out in a generalized rash, which Dr. Ahmed assumed to be an adverse reaction to the Vibramycin. Dr. Ahmed did no further investigation or consultation to determine if the rash was related to the one Ms. Wells had when seen at the emergency room on September 24, 1980. Dr. Ahmed replaced the Vibramycin with Erythromycin, and gave Ms. Wells Calamine lotion and Benadryl for the rash.
On October 2, 1980, Ms. Wells was released from the hospital, although the only lab results Dr. Ahmed had were abnormal. She returned to Dr. Ahmed's office the next day complaining that the rash had gotten worse. Dr. Ahmed gave Ms. Wells an injection of Benadryl and increased her dosage of Benadryl capsules. Dr. Ahmed noted that Ms. Wells had a swollen face and a swollen lymph node behind her ear, but ordered no further lab studies. Ms. Wells again returned to Dr. Ahmed on October 5th, 6th, 13th and 27th. On none of these visits did Dr. Ahmed choose to rerun any of the laboratory studies, which had earlier shown abnormal results, to determine the cause of Ms. Wells' illness.
On October 5, 1980, when Ms. Wells returned to the East Jefferson Hospital because the rash had still not gotten any better, she was seen by a doctor in the emergency room who started her on high doses of Prednisone, a steroid (which is used to treat lupus). When Ms. Wells saw Dr. Ahmed in his office the next day, October 6, 1980, she was feeling some relief from her symptoms, so Dr. Ahmed continued her on Prednisone and Benadryl. From October 6th through November 7th, 1980, Ms. Wells was treated with steroids and she showed improvement.
On November 10, 1980, after Dr. Ahmed had discontinued the steroids, Ms. Wells returned to the doctor with complaints of chest pain. Dr. Ahmed testified that he had discontinued the steroids because, in his opinion, Ms. Wells was in no apparent need of the drug. Despite the chest pain, Dr. Ahmed ran no EKG or any other lab studies, but instead continued her on Benadryl. Two days later, on November 12, 1980, Ms. Wells returned to Dr. Ahmed's office and saw his associate because Dr. Ahmed was not in the office. The associate noted his impression of Ms. Wells' condition *1276 to be "collagen vascular disease Lupus E," and spoke to Dr. Ahmed on the phone about Ms. Wells. Although Dr. Ahmed still chose not to rerun any lab tests or EKG's, the associate doctor ran a complete blood count and instructed Ms. Wells to return the next day.
When Ms. Wells returned on November 13, 1980, Dr. Ahmed decided that she still had a viral infection and again started her on Vibramycin, the antibiotic that Dr. Ahmed had previously considered to be the cause of Ms. Wells' rash.[2] Although Ms. Wells' condition on that day was characterized by labored breathing, lethargy and chest pains, Dr. Ahmed sent her home without running any tests. That same afternoon, Ms. Wells' condition became so severe that her mother contacted Dr. Ahmed. Dr. Ahmed admitted Ms. Wells to the hospital, whereupon her lab tests showed abnormally high results. In addition, Ms. Wells had fever, severe chest pain, tender abdomen, and an enlarged liver. Her heart was enlarged and was surrounded by fluid. The lab values taken upon her admission to the hospital indicated severe organ failure and tissue death.
Dr. Ahmed again prescribed Vibramycin without checking her medical record, and failed to reorder the steroid drug, Prednisone, even though he noted the possibility of collagen vascular disease on the physician's physical examination sheet. Dr. Ahmed did not come to the hospital that evening of November 13th to assess Ms. Wells' condition for himself. When Dr. Ahmed arrived at the hospital the next day, November 14, 1980, Ms. Wells' condition had worsened to such an extent that Dr. Ahmed was forced to consult with a cardiologist. The cardiologist ordered tests for lupus[3], and strongly recommended the institution of steroid therapy because he suspected collagen vascular disease.
Although the cardiologist recommended steroid treatment after his consult with Ms. Wells at 11:00 a.m. on November 14th, it was not until 9:20 p.m. that evening that Dr. Ahmed ordered the reinstatement of steroid therapy. Nine hours later, Ms. Wells was pronounced dead. Her immediate cause of death was cardiac arrest. Ms. Wells' family chose not to have an autopsy performed.
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Smith v. State through DHHR, 523 So.2d 815, 819 (La.1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La.1986). Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La., 1991); Smith, 523 So.2d at 822; Rosell v. ESCO, 549 So.2d 840 (La.1989); Hastings, 498 So.2d at 720.
The initial inquiry that we must address is whether the plaintiff proved by a preponderance of the evidence that the defendant's treatment of the patient fell below the ordinary standard of care. In his reasons for judgment, the district judge found that "the evidence cumulatively shows treatment which is below the standard of care for a doctor of internal medicine, such as Dr. Ahmed." The court of appeal stated that it had "serious reservations as to whether or not the fact-finder's conclusion that the defendant's treatment here fell below the proper standard of care was manifestly erroneous." 571 So.2d at 897. The appellate court did not fully address this issue since it chose to reverse the district court on determining that the plaintiff *1277 had not proven causation, the second required element of proof.
Had the appellate court fully reviewed the district court's determination that Dr. Ahmed breached the standard of care, it would have had to abide by the precept that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). We have instructed the appellate courts that where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d at 844; Housley, supra.
Our review of the record leads us to conclude that an appellate court could not properly have found the district court manifestly erroneous in making the determination that Dr. Ahmed's treatment of Ms. Wells fell below the ordinary standard of care expected of doctors of internal medicine. Dr. William McCormack, plaintiff's medical expert, testified that throughout the time Ms. Wells was under Dr. Ahmed's care, the treatment she received was below the appropriate standard of care in the following particulars:
1. Failure to properly evaluate the grand mal seizures;
2. Ill-advised prescription of Vibramycin;
3. Failure to run follow-up lab tests when abnormal results were obtained in liver function, heart studies, urinalysis, spinal fluid and chemistry profile;
4. Failure to obtain a thorough social, family and medical history;
5. Failure to associate the cessation of steroids with Ms. Wells' clinical deterioration;
6. Failure to make appropriate consultations.
Louisiana jurisprudence has held that expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill and knowledge, or failed to exercise reasonable care and diligence. Frasier v. Department of HHR, 500 So.2d 858, 861 (La.App. 1st Cir.1986). The determination of an expert's credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review. See, e.g., Anthony v. Hospital Service District No. 1, 477 So.2d 1180, 1184 (La.App. 1st Cir.1985); Rosell, 549 So.2d at 844.
The district court found the plaintiff's medical expert to be most credible. The extensive testimony of the this expert revealed that Ms. Wells fit the clinical picture for a lupus diagnosis because she was a young black female[4] with a positive anti-DNA test along with other abnormal lab values, seizures, rash, fever, and myocarditis over a period of several months which responded to steroids. Based on Dr. McCormack's testimony, the district court concluded that Dr. Ahmed's "failure to consider anything but a viral illness ... constitute[d] medical malpractice."
The district judge's inferences from the facts of this case, and his determination on the credibility of Dr. McCormack's extensive expert testimony, were reasonable determinations based on this record, requiring the appropriate deference from the court of appeal. The evidence and expert testimony justifies the district court's factual determination that "Dr. Ahmed failed to use reasonable care and diligence, along with his best medical judgment in the application of that skill." Therefore, the district court's determination that the plaintiff met the first element of proof cannot be said to be manifestly erroneous.
The next issue is whether the plaintiff proved causation by a preponderance *1278 of the evidence. We have previously explained that to establish causation in a situation where the patient dies, the plaintiff need only prove that the defendant's malpractice resulted in the patient's loss of a chance of survival, and that the plaintiff need not shoulder the "unreasonable burden" of proving that the patient would have survived if properly treated. Smith, 523 So.2d at 820 (citing Hastings, 498 So.2d at 721). We have also consistently held that causation is a factual finding which should not be reversed on appeal absent manifest error. Housley v. Cerise, supra; Smith, 523 So.2d at 822; Hastings, 498 So.2d at 720; see also Rosell v. ESCO, 549 So.2d 840 (La. 1989).
In holding that the plaintiff failed to prove causation, the court of appeal cited our decision in Cangelosi v. Our Lady of the Lake Medical Center, 564 So.2d 654 (La.1989). In that case we explained that the plaintiff fails to prove that, more probably than not, the injury was the result of negligence, where it is equally plausible that the defendant's negligence caused the injury as it is that the injury was caused otherwise. The court of appeal seized upon the district judge's statement that "[w]e don't know if [Ms.] Wells died of lupus," to conclude that because the cause of death remains unknown, it is equally plausible that death resulted from an untreatable viral infection, as diagnosed by Dr. Ahmed, as it is that the cardiac arrest was a complication of undiagnosed and untreated lupus.
This interpretation of the district court's reasons was erroneous in our view. While the district court did make the above statement, the court of appeal took it out of context. In reasons for judgment, the district judge stated, "We don't know if [Ms.] Wells died of lupus, but this court thinks that Dr. Ahmed had a duty to rule this out. His failure to consider anything but a viral illness and his use of Vibramycin to combat that illness constitute medical malpractice." The district court's reasons taken as a whole and in context, however, make it evident that the the district court indeed determined that although the cause of Ms. Wells' death is not known to a certainty, lupus was more probably than not the cause of death[5], and that Dr. Ahmed's improper treatment destroyed Ms. Wells' chance to survive this treatable disease.[6]
The court of appeal reached its "equally plausible" conclusion for the reason that Dr. Ahmed and his two medical expert witnesses "all [ ] agreed that the most probable cause of death was an untreatable viral infection." 571 So.2d at 896. However, the record reveals that one of Dr. Ahmed's experts was impeached with prior inconsistent statements, and testimony by Dr. Ahmed himself revealed that that he was unclear on the difference between treating viral and bacterial illnesses. The district judge, sitting as fact finder, was best able to assess the credibility of the witnesses who gave conflicting testimony as to the cause of death. The district court's evaluation that plaintiff's medical expert was more credible was a reasonable determination, and the court of appeal erred in substituting its own evaluation. Housley, supra; Rosell, 549 So.2d at 844.
In his reasons for judgment, the district court pointed to the evidence that "three other doctors had recommended that [Dr. Ahmed] consider treating Ms. Wells for a collagen vascular disease, but he kept treating her for a viral illness." The record also shows that these three doctors, the emergency room physician, Dr. Ahmed's associate, and the cardiologist, all suspected lupus on their first consultation with Ms. Wells. The district court correctly stated that "a mistaken diagnosis constitutes *1279 malpractice when the physician fails to exercise that standard or degree of care in diagnosing which should have been used by a competent member of his specialty."[7] LSA-R.S. 9:2794.
The record reveals that Dr. Ahmed chose not to run lab studies to determine the cause of Ms. Wells' chronic illness. Furthermore, because steroid treatment was inconsistent with Dr. Ahmed's untreatable viral illness theory, he chose to take her off of Prednisone even though she showed improvement during the time she was being treated with that steroid drug. The district court was correct in finding that Dr. Ahmed "had a duty to rule [lupus] out" under these circumstances, and that "his limited view of the case decreased [Ms. Wells'] chances for survival." This finding is consistent with "the basic rules of medicine [which] require that doctors rule out all life-threatening illnesses that the symptoms could have indicated." Sewell v. United States, 629 F.Supp. 448 (W.D.La. 1986).
The record gives ample support for the district court's conclusion that although the cause of death is not known with certainty, lupus was more probably than not the cause of Ms. Wells' death, and that Dr. Ahmed's improper treatment destroyed her chance to survive this treatable disease. We hold that the court of appeal's finding to the contrary did not accord the appropriate deference to the district judge's reasonable inferences drawn from the evidence and his resolution of credibility issues.
We turn now to the argument of the Louisiana Patient's Compensation Fund that the damages awarded by the district court were excessive and not supported by the evidence. The district court awarded $150,000 in a single sum to the plaintiff, Ms. Wells' mother.[8] Although the damages were not separately stated regarding the wrongful death and survival claims, the district court stated in reasons for judgment that the award included amounts for loss of love and affection, and loss of services that Ms. Wells provided for her family (wrongful death damages), as well as an amount for the decedent's pain and suffering prior to her death (survival damages).
Regarding the mother's wrongful death damages, the evidence adduced at trial through the testimony of the plaintiffmother revealed, among other things, that Ms. Wells was still living with her mother, and that the two enjoyed a close relationship, sharing household chores and living expenses. Regarding the survival action damages, the record shows that Ms. Wells underwent several weeks, if not months, of severe pain and suffering. Her relatively slow demise no doubt subjected Ms. Wells to fear her impending death.
Based on the evidence in the record, it cannot be said that the district court abused its discretion in making an award of $150,000 for the combined wrongful death and survival damages. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1976).

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed and the judgment of the district court is reinstated.
COURT OF APPEAL JUDGMENT REVERSED; DISTRICT COURT JUDGMENT REINSTATED.
COLE, J., respectfully dissents.
NOTES
[1] Phonetically "Joyce," although spelled differently on her birth certificate.
[2] Dr. Ahmed testified that this was "a mistake" because he did not have Ms. Wells' record in that particular office.
[3] The anti-DNA test result was out of the normal range (4, where normal range is 1-3); however, this test result was not available until after Ms. Wells' death.
[4] Dr. McCormack testified that lupus is found most often among young women between the ages of twenty and forty, and that the disease is present in black women about three times as often as it is in white women.
[5] The district court stated that "Dr. McCormack was the most convincing expert witness at this trial. Dr. McCormack said that [Ms. Wells] probably had lupus." Reasons at 8. These statements read together are the equivalent of a finding that Ms. Wells "more probably than not" had lupus. A trial judge need not use "magic words" in order for his judgment to be accorded the appropriate deference.
[6] In his reasons for judgment, the trial judge said that "it is clear that [Ms. Wells'] chances of survival were decreased by Dr. Ahmed's improper treatment, which consisted of the failure to use reasonable care and diligence in the treatment of the patient as noted above."
[7] We recognize that a physician undertaking treatment of a patient does not guarantee a cure, and that unsuccessful treatment is not always an indication of malpractice because despite the best skill and judgment of competent doctors, unfortunate results may still occur. See Gunter v. Plauche, 439 So.2d 437, 439 (La. 1983); Mariano v. Tanner, 497 So.2d 1066, 1069 (La.App. 5th Cir.), writ denied, 501 So.2d 235 (La.1986); Gurdin v. Dongieux, 468 So.2d 1241 (La.App. 4th Cir.), writ denied, 474 So.2d 946 (La. 1985).
[8] The co-plaintiff, Roger Martin, was not Ms. Wells' father, but her step-father.