601 So.2d 677 (1992)
Cindy Kees BOLTON, et al., Plaintiffs-Appellants,
v.
LOUISIANA STATE UNIVERSITY MEDICAL CENTER, et al., Defendants-Appellees.
No. 23531-CA.
Court of Appeal of Louisiana, Second Circuit.
May 13, 1992.
*679 Michael D. Cox, Shreveport, and Henri Loridans, Bossier City, for plaintiffs-appellants.
Richard Ieyoub, Atty. Gen., and Walker, Tooke, Perlman & Lyons, Sp. Asst. Atty. Gen. by Jerald L. Perlman, Shreveport, for defendants-appellees.
Before NORRIS, HIGHTOWER and BROWN, JJ.
HIGHTOWER, Judge.
Cindy Kees Bolton, who alleged that the Louisiana State University Medical Center ("LSU-MC") negligently caused her husband's death by administering excess amounts of intravenous fluids, appeals from a judgment rejecting her demands. We affirm.

FACTS
Robert Bolton, age 26, died at LSU-MC on April 27, 1984. Notwithstanding appellant's contentions that the four months of treatment preceding her husband's demise are "interesting but essentially non-contributory," we find it necessary to discuss that aspect of the decedent's medical history, as well as his final hospitalization.
On January 2, 1984, after spending the previous day vomiting and experiencing severe abdominal cramps, Bolton presented himself for medical treatment at the Bossier Medical Center. There, an examination convinced Dr. John Webb that the patient suffered from gastritis, rather than appendicitis as Bolton verbalized. Prescribing medication, the physician sent the young man home for bed rest. Still ill the next day, Bolton went to Bossier Acute Care Clinic, where Dr. Webb once again attended him. Noting no signs of recovery, the doctor recommended a visit to LSU-MC.
Upon Bolton arriving at the suggested facility early that same evening, emergency room personnel immediately diagnosed acute appendicitis. After the patient received intravenous injections to replace fluids lost during the past 48 hours, Dr. Forrest Wright performed an appendectomy, at approximately noon on January 4.
During this procedure, the surgeon discovered that the appendix had already ruptured, perforated and adhered to the sigmoid colon, forming an abscess at the attachment. Visual inspection also disclosed significant inflammation and infection of the abdomen. Additionally, the appendix had become necrotic (dead tissue) and eroded, indicating to Dr. Wright that the organ had ruptured at least twenty-four hours, if not days, earlier. In repairing the evident damage, the surgical team deemed it necessary to remove a portion of Bolton's intestine and perform a colostomy. Thereafter, the patient's January hospitalization progressed uneventfully.
On April 11, 1984, Bolton returned to LSU-MC for a scheduled colostomy closure, which another surgeon performed some five days before Dr. Richard Byrd began monitoring treatment. Prior to discharge from the hospital on April 21, the patient produced multiple satisfactory bowel movements, passed gas frequently and tolerated solid food for two or three meals.
The period with which we are principally concerned, however, began three days later. On April 24, 1984, Bolton again sought treatment upon experiencing nausea, diarrhea and vomiting, following his meal the previous evening. Despite Dr. Stephen Sessums' telephonic instructions to come immediately to the emergency room, Mrs. Bolton took her husband to the walk-in clinic at LSU-MC. Discouraged by the potential five hour wait, the Boltons finally returned home.
Detecting no subsequent improvement in the husband's symptoms, the couple returned to LSU-MC the next morning, this time reporting to the emergency room. *680 Physical examination by Dr. John Price, the ER physician, revealed definite bowel sounds and no tenderness in the abdominal area. Though Bolton's blood pressure initially registered within the normal range, the reading dropped and heart rate increased when the patient assumed a sitting position. These results, suggestive of dehydration, prompted an initial diagnosis of gastroenteritis and orders for standard laboratory work, x-rays and administration of IV fluids. Dr. Sessums concurred in this evaluation and, in turn, fully informed Dr. Byrd. Receipt of the laboratory reports later that afternoon confirmed the diagnosis of dehydration and volume depletion.
Between 9:00 a.m. and 4:00 p.m. on the date of admission (April 25), the physicians ordered approximately 3000 cc's of normal saline fluid as treatment for dehydration. Due to spillage, however, Bolton received only 2200 cc's. Initially, he improved as desired. His blood pressure rose to 140/100, a slightly elevated figure, possibly attributable to pain.
Unfortunately, beginning about 4:00 p.m., the patient's condition unexpectedly and dramatically deteriorated. The next recorded blood pressure reading of 80/0, at about 5:00 p.m., reflected a condition of profound shock. Also, at this early point, according to trial testimony, Bolton's chances of survival had dropped to ten or fifteen percent. Recognizing an extremely serious situation, Dr. Byrd and the other attending physicians set up a miniature intensive care unit in the hospital room assigned to plaintiff's husband.
Beginning to suspect septic shock, the doctors decided to surgically explore the abdomen, hoping to discover the origin of the deterioration. In anticipation of that procedure, they sought to raise and stabilize the patient's blood pressure by ordering the administration of large amounts of IV fluids. Otherwise, in his existing condition, he could not have survived either anesthesia or surgery. Such preparatory measures resulted in the administration of approximately an additional 7000 cc's of IV fluid, as well as a broad spectrum of antibiotics.
During the subsequent operation, initiated at 11:30 p.m. on April 25, the doctors continued to prescribe IV fluids, yet removed some 5000 cc's from the bowel and colon. Other liquids also evaporated while the abdomen remained open. Exploration revealed an intestinal obstruction at the site of the colostomy closure. The bowel, which exhibited a viable pulse, did not seem gangrenous. Though certain portions of the organ appeared somewhat discolored, this improved before closing. Striving to save as much of the bowel as possible during a five-hour procedure, the surgeons removed the obstructed section of the sigmoid colon and performed two colostomies.
Shortly after the 5:00 a.m. conclusion of surgery, the patient's blood pressure dropped to 50/0, a condition normally incompatible with sustained life. All the experts later agreed, and appellant conceded at oral argument, that this signified the "point of no return" for Robert Bolton. Yet, despite a zero percent chance of survival, attempts to save his life continued. These efforts included the administration of massive amounts of IV fluid intended to raise the blood pressure, and also a second-look surgery, resulting in removal of the entire then-gangrenous bowel. During this second surgical procedure, beginning about 8:15 p.m. on April 26 and again requiring almost five hours, Bolton suffered cardiac arrest but the physicians resuscitated him. Unfortunately, they did not have similar success during a later episode. Bolton died at 5:02 a.m. on April 27, 1984.
An autopsy showed the probable cause of death to be septic shock due to bowel infarction. Medical testimony reveals that septic shock, or sepsis, interferes with the ability of the body to maintain blood pressure. By destroying peripheral vascular resistance, this condition breaks down the integrity of the capillaries, resulting in the contents of these vessels leaking into the interstitial space of the body. Administration of large amounts of IV fluids constitutes the mainstay treatment.
Mrs. Bolton, individually and on behalf of her minor children, initially sued Dr. John Webb, Bossier Medical Center, and LSU-MC; *681 however, she subsequently settled her claims against the first two parties. After a bench trial on the merits, the district court dismissed plaintiff's demands against the sole remaining defendant. This appeal ensued.

DISCUSSION
Both at trial, and now on appeal, appellant has focused her allegations of malpractice upon the administration of intravenous fluids during her husband's final hospitalization. The several issues and factual errors argued here can be summarized in a single question: Did the trial court commit manifest error in its factual finding that appellant failed to prove any of her claims against appellee, its physicians or employees?

Burden of Proof & Standard of Review
In a malpractice action against a hospital, under the theory of respondeat superior, the standard of care and burden of proof involved is the same as for the physician whose activities are questioned. Bryant v. St. Paul Fire & Marine Ins. Co., 382 So.2d 234 (La.App. 3d Cir.1980). Likewise, in a medical malpractice action against a physician or surgeon, the plaintiff must establish that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical speciality, and also that a causal relationship existed between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Smith v. State, through DHHR, 523 So.2d 815 (La.1988). In reference to causation in the circumstance where a patient dies, the plaintiff need only prove that the defendant's malpractice resulted in the loss of a chance of survival, and is not faced with the unreasonable burden of demonstrating that the patient would have survived if properly treated. Martin, supra; Smith, supra; Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986).
Of course, each causation inquiry concerns an issue of fact. Martin, supra. Thus, our review is constrained by the manifest error standard, which demands that findings of fact by the trial court be given great deference and disturbed only when clearly wrong. Even if there is conflict in the testimony, reasonable inferences of fact should not be disturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). Also, when findings of fact are based upon decisions regarding the credibility of witnesses, respect should be given to those conclusions, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on understanding and believing what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989). Indeed, this court is mandated not to substitute its own evaluations and inferences for those of the trier of fact. Winford Co. Inc. v. Webster Gravel & Asphalt, 571 So.2d 802 (La.App. 2d Cir.1990); Wood v. Haas, 451 So.2d 160 (La.App. 1st Cir.1984), writ denied, 458 So.2d 124 (La. 1984).

Credibility of Expert Witnesses
Finding Dr. Sheldon Kottle to be the most qualified expert presented on the subject of fluid management, the district court accepted his opinion that the physicians on duty did not breach the standard of care owed under the circumstances. Yet, appellant assails the adoption of that testimony, as opposed to that of their own expert, Dr. Ricky Hendrix, and even levels contentions of bias at Dr. Kottle.
First of all, of course, the effect and weight to be given expert testimony is within the broad discretion of the trial judge. Winford, supra; Sawyer v. Niagara Machine and Tool Works, 535 So.2d 1057 (La.App. 2d Cir.1988), writ denied, 536 So.2d 1222 (La.1989); Friday's Plumbing and Heating Co. v. Byers, 415 So.2d 256 (La.App. 2d Cir.1982). The importance placed upon such testimony is largely dependent upon the expert's qualifications and the facts that form the basis of his opinion. Middle Tennessee Council Inc. v. Ford, 274 So.2d 173 (La.1973); Winford, supra. Where there are contradictory expert opinions concerning compliance with the standard of care, the reviewing court will give great deference to the conclusions *682 of the fact-trier. Arceneaux, supra; Broadway v. St. Paul Ins. Co., 582 So.2d 1368 (La.App. 2d Cir.1991).
Secondly, Dr. Kottle's credentials and experience fully justify acceptance of his testimony. Although appellant's expert similarly practices nephrology, only Dr. Kottle qualifies as a fellow of the prestigious American College of Physicians. Furthermore, while not certified, he is board eligible in the relatively new speciality of critical care, involving the administration of IV fluids to seriously ill patients, and such measures are regularly undertaken by him. Quite clearly, then, we cannot say that the trial court erred in favoring his opinion.

Evidence of Septic Shock
In taking issue with the conclusion that death resulted from the effects of severe septic shock, appellant points to the fact that none of the disclosed blood cultures produced a positive result for infection. However, four physicians explicitly testified that, under circumstances as existed here, there often will be no culturable infection. In fact, according to Drs. Kottle and Byrd, positive showings are attainable in only about one-third to one-half of such cases.
Dr. Byrd explained that the septic shock condition, which manifested itself when the patient's blood pressure dropped to 80/0, likely originated from a small leak in the abdominal anastomosis prior to the final hospitalization. Furthermore, the doctor opined that the sepsis set into motion a cascade of events which eventually led to Bolton's demise, and that the exhibited symptoms typified a classic case of septic shock. Dr. Kottle noted that the autopsy findings confirmed that diagnosis, and none of the testifying doctors contested the existence of sepsis in Bolton's system. Thus, the record fails to disclose manifest error in the conclusion that the decedent suffered from the effects of septic shock.

Administration of Intravenous Fluids
Appellant basically maintains that fluid overloading caused the death of her husband by inducing pulmonary edema and congestive heart failure. In addressing these contentions, greater ease of understanding results by dividing the final hospitalization into four time segments:
(1) from 9:00 a.m. to 4:00 p.m., April 25;
(2) from 4:00 p.m. to almost midnight, April 25;
(3) from almost midnight to 5:00 a.m., April 26; and
(4) from 5:00 a.m., April 26 to 5:02 a.m., April 27.
With an admitting diagnosis of gastroenteritis and dehydration on April 25, the physicians initially utilized IV injections to replace fluids lost through vomiting and diarrhea. Appellant nonetheless argues that by 10:00 that morning, when the blood pressure reading rose to 140/100 and the respiratory rate increased, her husband's intravascular volume had been filled and no need existed for more fluids. That assertion, however, finds no support in the medical testimony. Indeed, her own expert, as well as those presented by appellee, considered the 2200 cc's given during this first seven-hour period to be completely appropriate. As indicated by the weight of the evidence, septic shock caused the patient's blood pressure to plummet later that afternoon, signaling a sudden crash in his condition.
Concerning the second time period, essentially from the drop in blood pressure (to 80/0) until the beginning of the first surgery, the record adequately demonstrates the necessity to treat the septic shock aggressively with IV fluids. Before surgery could become a viable option, the patient's blood pressure needed to be closer to normal limits. Moreover, the medical experts agreed, and later events established, that this could be accomplished only through aggressive fluid therapy. To monitor the patient's progress, Dr. Byrd and the other attending physicians set up a miniature intensive care unit in Bolton's room, as previously mentioned. This measure, in the opinion of Dr. Kottle, exceeded any steps required by the standard of care.
Immediately before beginning the first surgical procedure, the doctors installed a central venous pressure ("CVP") line as an *683 additional monitor of intravascular volume and to aid in determining the proper amount of fluid to administer. An initial reading of four (normal being zero to five) indicated the absence of overloading. During their testimony, Drs. Hendrix, Byrd and Kottle all interpreted that result as validating the appropriateness of those amounts of fluid previously given. Though Dr. Kottle indicated he would have emplaced the CVP line earlier, he acknowledged that the measurement obtained showed that no harm had occurred by waiting.
Reading from the death summary and not the medical chart, appellant contends the CVP initially measured five to ten, rather than four. However, at trial, all medical witnesses found the first charted CVP metering to be four. In any event, the reading of four, be it first or second, verified that the fluid therapy had functioned as intended.
The third interval generally covers the first surgery. During that procedure, the physicians suctioned at least 5000 cc's from the patient's abdomen and an additional amount evaporated. According to medical testimony, despite moderate success shown by rising CVP levels, the continued instability of Bolton's blood pressure required persistence in administering fluids. Although CVP measurements exceeded the textbook definition of overload, all other clinical parameters pointed to the patient's dire need for more fluid.
In the words of Dr. Travis Phifer, head of the medical team supervising Bolton's care: "[Y]ou treat the patient, not the number. If you treat the number, you wind up with some nice numbers and a dead patient." Also, Dr. Ronald Nichols indicated that, notwithstanding the high readings, he would have diminished the IV fluids only if other vital signs improved. Even though Dr. Hendrix believed some of the CVP values signaled volume overload, when pressed, he agreed with the other testifying physicians, none of whom found fault with the fluid administered during this stage.
In the recovery room, at an early stage of the fourth phase, surgeons installed a Swan-Ganz catheter, designed to monitor the pulmonary capillary wedge pressure ("PCWP") and provide a more sensitive assessment of intravascular volume. Although a result between zero and ten would be normal for a healthy person, Bolton's first recorded measurement of eleven, at 9:45 a.m., suggested that still more fluid could be safely administered, if needed. At trial, expressing agreement with Dr. Kottle on the subject, Dr. Hendrix explained that this reading validated all fluid given up to that time. Of course, with the patient's blood pressure concurrently dropping to 50/0, none of the subsequent measures produced any detrimental effect on his chance of survival.
Criticizing the doctors' decision not to decrease fluids when higher than normal CVP and PCWP readings appeared, appellant argues that this conduct equated to a failure to monitor. All of the testifying experts acknowledged, however, that the proper administration of fluid requires a multi-factoral analysis. Not only must a physician consider the CVP or PCWP readings, but he must also consider pulse rate, blood pressure, urine output, oxygenation, fluid in airways, neck vein, skin color, etc. Dr. Hendrix explained that the treatment of many patients will extend beyond textbook guidelines. In fact, in reference to individuals suffering septic shock, Dr. Kottle, the critical care expert, noted that the goal is to exceed normal wedge pressure.
Relying on an excerpt from Dr. Hendrix's testimony, appellant asserts that a CVP reading of 20, reached during the first surgery, signified fluid overload. Still, appellant's expert readily acknowledged that the reading represented only one of the parameters that should appropriately be considered. Furthermore, Dr. Hendrix could not disagree that the subsequent PCWP reading of eleven validated all prior fluid therapy.
Considering the record, then, we cannot dispute the conclusion of the trial court that, rather than causing or contributing to the patient's demise, the IV fluids given *684 prolonged his life. As stated by the district judge, Robert Bolton died from the effects of severe septic shock, not fluid overload.

Pulmonary Edema and Congestive Heart Failure
As noted, appellant theorizes that excessive amounts of IV fluid caused her husband to develop pulmonary edema, and eventually congestive heart failure. Only Dr. Hendrix agreed that the injected liquids could have produced such results. Conversely, the more credible expert, Dr. Kottle, stated that nothing in the clinical data of this case substantiated such an occurrence, an occurrence which he viewed as merely hypothetically possible. Thus, the testimony more than adequately supports the trial court's rejection of this contention by plaintiff.

CONCLUSION
After a thorough review and evaluation of the record, concluding that the evidence supports the facts found and the reasons assigned by the trial judge, we affirm at appellant's costs.
AFFIRMED.