HIGHTOWER, Judge.
Cara McCraw, who alleges that through medical malpractice the staff of Louisiana State University Medical Center (“LSU-MC”) caused her child to suffer severe brain damage, appeals a judgment rejecting her demands. We affirm.
FACTS
During the early morning hours of April 12, 1986, McCraw gave birth to a baby girl, Nakia. After a normal delivery and a 30-hour stay in the nursery of LSU-MC, attending physicians released the mother and her then-healthy daughter from the hospital.
Returning to the emergency room at approximately 4:00 p.m. on April 20, 1986, the mother stated that her child had not been eating well and, for at least three days, had been demonstrating signs of fever. Athough having previously noticed that the infant felt warm and despite having treated that symptom with Tylenol, McCraw had never taken Nakia’s temperature. She further reported that, earlier that day, her daughter suffered three seizures. At approximately 2:00 a.m., Nakia’s arms had begun shaking. This con *769 tinued for about a minute and the baby-turned blue around the mouth, before beginning to cry and regaining her normal coloring. Later, she experienced similar episodes at 7:00 a.m. and in the afternoon before the trip to LSU-MC.
Nakia exhibited a temperature of 101.9° upon examination in the emergency room, and, indeed, experienced another seizure in the physician’s presence. Considering these symptoms and a cloudy yellow spinal fluid with drastically irregular amounts of protein, glucose, and white blood cells, the doctors determined the child to be suffering from pneumococcal bacterial meningitis, a diagnosis later confirmed by additional laboratory tests. This very serious condition, if not successfully treated in the extremely early stages, i.e. within the first few hours, results in significant damage to the brain. Thus, in efforts to combat the infection, the physicians prescribed and administered massive doses of antibiotics. Nonetheless, the infant’s seizures continued.
During an ensuing six-week hospital stay, Nakia developed hydrocephalus (a condition characterized by the abnormal accumulation of fluid in the cranial vault). Thus, beyond monitoring the progress of the infection, the physicians also closely watched the effects of this additional complication, regularly measuring the child’s head circumference and observing the condition of her fontanelle (the soft spot remaining in the skull of an infant). Even so, the medical team declined to surgically implant a shunt (a tube utilized to relieve intracranial pressure by connecting the fluid-containing spaces of the brain with a cavity outside the brain). Finally, when the infant had no more fever and the severity of the infection decreased, the doctors discharged her on May 31, 1986.
On June 11, 1986, prompted by another worsening of Nakia’s condition, the mother returned her daughter to LSU-MC. Upon admission, physicians noted a significant increase in the circumference of the infant’s head. On June 13, Dr. Edward Benzel, neurosurgeon, concluded that the meningitis had been adequately abated by the antibiotic therapy, and, thus, a shunting procedure could be performed with minimal risk. Understandably, however, this surgical process could not reverse the extensive neurological devastation already present. Complications later required replacement of the shunting tube, but the device subsequently has been adequately maintained.
Due to the severe neurological damage, Nakia is now mentally retarded, functioning at the level of a one-year old. McCraw, alleging that her child received substandard care at LSU-MC, filed suit in January 1987. After trial on the merits, the lower court found no malpractice and dismissed plaintiffs claims. This appeal ensued.
DISCUSSION
In her appellate brief, McCraw cites two specific instances of hospital malpractice. She contends that, because her child had an extremely high white blood cell count immediately after birth, Nakia should not have been released on April 13 without determining the cause of this condition. Furthermore, appellant argues that the hydrocephalus, not the meningitis, caused the major part of the infant’s brain damage. Therefore, the hypothesis continues, implanting the shunt earlier would have lessened the degree of neurological impairment.

Burden of Proof & Standard of Review

In a malpractice action against a hospital, under the theory of respondeat superior, the standard of care and burden of proof involved is the same as for the physician whose activities are questioned. Bolton v. Louisiana State Univ. Med. Ctr., 601 So.2d 677 (La.App. 2d Cir.1992). Likewise, in a medical malpractice action against a physician or surgeon, the plaintiff must establish that the doctor’s treatment fell below the ordinary standard of care expected of physicians in his medical speciality, and also that a causal relationship existed between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Bolton, supra. However, the law does not require absolute precision from a physician. Instead, the doctor’s professional judgment and conduct are evaluated in terms of reasonableness under the then-existing *770 circumstances, not in terms of hindsight or in light of subsequent events. Iseah v. E.A. Conway Memorial Hosp., 591 So.2d 767 (La. App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992); Broadway v. St. Paul Ins. Co., 582 So.2d 1368 (La.App. 2d Cir.1991).
Of course, in a medical malpractice action, credibility determinations, including the evaluation and resolution of conflicts in expert testimony, together with causation inquiries, concern factual issues. Bolton, supra; Iseah, supra. Thus, our review is constrained by the manifest error standard, which demands that findings of fact by the trial court be given great deference and disturbed only when clearly wrong. Even if there is conflict in testimony, reasonable inferences of fact should not be disturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Also, when findings of fact are based upon decisions regarding the credibility of witnesses, respect should be given to those conclusions, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on understanding and believing what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989). Indeed, this court is mandated not to substitute its own evaluations and inferences for those of the trier of fact. Bolton, supra; Winford Co. v. Webster Gravel & Asphalt, 571 So.2d 802 (La.App. 2d Cir.1990).

White Blood Cell Count

Laboratory analysis taken immediately after Nakia’s birth revealed a white blood cell count (WBC) of 30,000. MeCraw, viewing this as an excessively high reading that indicated infection, contends her baby should not have been discharged the following day without further investigation. Notably, at oral argument, appellant conceded this to be the weaker of her claims. Nonetheless, in support of this contention, the mother elicited testimony from Dr. George Udvarhelyi, an expert in neurosurgery. Although stating his belief that the WBC evinced an infection warranting further analysis, this physician qualified that position by professing no expertise in either infectious diseases or neonatal care.
A pediatric neurologist called as an expert by LSU-MC, Dr. Gwendolyn Hogan, definitively testified that the WBC fell within the normal range for newborn infants. Attributing the elevated reading to cord blood, she indicated that only if the figure had been accompanied by another factor, such as fever, would repetition of the laboratory analysis and retention of the baby for further observation possibly have been appropriate. However, Nakia remained afebrile throughout her stay in the hospital nursery. In fact, on the date of discharge, her temperature registered a normal 98.2°. Hence, as the trial court correctly concluded, MeCraw failed to establish that the applicable standard of care precluded the child’s release on April 13, 1986.

Timeliness of the Shunt Procedure

Appellant further contends that her daughter’s neurological deficit would have been less severe if LSU-MC had provided her with non-negligent care during the period of hospitalization between April 20 and May 31, 1986. Specifically, she argues that the ventriculoperitoneal shunt should have been neurosurgically installed on either April 28 or May 5, 1986.
Essentially, two theories concerning the cause of Nakia’s brain damage emerge from the testimony. All parties agree that the child suffered pneumococcal bacterial meningitis and that this condition can produce brain damage. Also, meningitis will often cause hydrocephalus. In the present case, appellant, supported by the testimony of Dr. Udvarhelyi, postulates that the meningitis produced the hydrocephalus, which in turn contributed significantly to the infant’s neurological deficiency. Appellee, however, attributes the predominant brain damage directly to the meningitis which went untreated several days before admission to the hospital.
As explained by Dr. Udvarhelyi, hydrocephalus is the expansion of the ventricles (cavities) in the brain which, in turn, influences the circulation of cerebrospinal fluid and leads to enlargement of the head itself. Continuing, he opines that some form of obstruction prevented Nakia’s brain from absorbing *771 the fluid, a condition termed communicating hydrocephalus. In his evaluation, the various test results revealed a continual growth of the ventricles during the six weeks of hospitalization. Enlarged ventricles exert pressure on the brain, cutting off the blood and oxygen supplies, eventually causing death of the brain tissue. Thus, a definite relationship exists between increased ventricle size and neurological impairment. In response, a shunt can relieve the escalating pressure in the ventricles and prevent additional brain damage. To support his theory in the present ease, the neurosurgeon cited the increasing circumference of the child’s head. The growth reported in that regard between May 22 and May 30, in his view, represented a deviation from normally accepted patterns.
On behalf of appellee, Dr. Hogan and neurosurgeon, Dr. Donald Smith, both of whom participated in Nakia’s care, classified the child’s condition as ex vacuo, rather than communicating, hydrocephalus. In this form of the disorder, the ventricles enlarge due to an absence of brain mass. These experts explained that, when brain tissue is damaged and dies, it is then absorbed. Since the skull is a certain size, this brain atrophy or shrinkage creates a vacuum, causing the empty space to fill with cerebrospinal fluid. Dr. Hogan testified that shunting a child with ex vacuo hydrocephalus presents a risk that the ventricles will collapse.
Dr. Udvarhelyi dismissed the validity of this diagnosis, contending instead that Na-kia’s problems arose from high intracranial pressure. However, the record clearly shows that daily monitoring by the LSU-MC staff regularly found the child’s fontanelle to be soft, flat, depressible, and pliable. Dr. Hogan explained that this physically confirmed a lack of significant increase in intra-cranial pressure. Further, Drs. Hogan and Smith both opined that Natía experienced no abnormal head increases during the initial hospitalization (April 20 through May 31). Circumference measurements charted by the various staff members showed growth following accepted standards, hovering near the fiftieth percentile. In point of fact, in late May, Dr. Hogan noted the sutures of the infant’s head beginning to override, indicating an attempt by the skull to become even smaller, a condition consistent with ex vacuo hydrocephalus. Throughout trial, appellee maintained that shunting is appropriate for patients with an enlarged head and increasing cranial pressure, neither of which Natía suffered during the period in question.
Additionally, all of the experts agreed that the ventriculoperitoneal shunt should not be emplaced in the presence of an active infection. Doing so would spread any infection from the brain to the peritoneal- cavity. Furthermore, since a shunt is a foreign body, the bacterial infection could colonize around the device and, also, abscess along the tract where the neurosurgeon inserts the tube into the brain. Dr. Udvarhelyi maintained that shunting nevertheless became a viable option when, on April 28 and May 5, laboratory reports confirmed the absence of infection, in that two-day old spinal fluid cultures appeared to be sterile. Conversely, Drs. Hogan and Smith explained that the antibiotics prescribed for Natía would first inhibit the growth of, and then Mil, the bacteria. Thus, although organisms could still be present in the spinal fluid, these would not necessarily flourish in an artificial medium.
Furthermore, other evidence of infection remained present in samples of Nakia’s spinal fluid: high quantities of protein, elevated amounts of white and red blood cells, and dangerously low glucose levels. Even Dr. Benzel, an expert neurosurgeon at LSU-MC who agreed with Dr. Udvarhelyi’s diagnosis of communicating hydrocephalus, asserted that the presence of an infection, as late as May 5, contraindicated shunting. This physician further stated that, at that time, the risk of catastrophic complications from em-placing a shunt to treat the hydrocephalus far outweighed any minuscule potential benefits. Indeed, he asserted that waiting and observing the child’s condition, before performing the surgery, probably allowed her to live. Although Dr. Udvarhelyi opined that failure to shunt on May 5 fell below the standard of care, he concurred with Dr. Ben-zel that deciding when to perform shunting constitutes a judgment call for the attending *772 physician based upon the available information.
Additionally, the record amply sustains the trial court conclusion that, by the time McCraw returned to LSU-MC with Nakia on April 20, 1986, significant functional brain damage already existed. In support of appellant’s claim that the hydrocephalus, rather than the meningitis, caused the neurological deterioration, Dr. Udvarhelyi testified that his review of the medical charts failed to reveal any notation of neurological deficit, excluding the seizure activity, during the initial hospitalization. All three experts from LSU-MC disagreed with that conclusion, however.
Asserting that Nakia’s chance for a good neurological outcome had been markedly reduced once the first seizure occurred, Dr. Hogan stated that most of the brain damage transpired well before May 5. Examination of a late April CT scan revealed large areas of infarction. This meant, according to the doctor, that the blood supply to the area had been cut off, resulting in brain damage. In that regard, the frontal area of both hemispheres had been affected. Indeed, on April 28, the pediatric neurologist noted Nakia’s prognosis for neurological function to be almost nil. Further, Dr. Smith explained that in meningitis patients, the probability of brain damage is inversely related to the glucose level, i.e., the lower the glucose during the period of active infection, the greater the likelihood of permanent residual effects. Na-kia suffered drastically low glucose levels throughout her hospitalization. Also, Dr. Benzel opined that the fulminant infectious process had badly injured Nakia by the time her mother sought medical care on April 20. Anyone who experiences smoldering meningitis for several days, he explained, would be expected to suffer profound neurological devastation.
After a thorough review of the record, we conclude, as did the lower court, that McCraw failed to establish that LSU-MC breached any applicable standard of care.[1] Nor, similarly, did she demonstrate causation between any hospital action and her daughter’s neurological impairment.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed at appellant’s costs.
AFFIRMED.

. Concerning the issue of the timeliness of the shunting procedure, appellant contends that only expert neurosurgical testimony should be considered in determining the applicable standard of care. Even if, however, for the sake of argument, we restricted our review of testimony to the neurosurgeons alone, the evidence would still preponderate against a finding of malpractice.