NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

07-1465


JOSEPH M. BYNOG, JR.

VERSUS

JOHN VALENZUELA, ET AL.


**********
APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 220,808
HONORABLE JOHN C. DAVIDSON, DISTRICT JUDGE
**********

GLENN B. GREMILLION
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and Glenn B. Gremillion, Judges.


AFFIRMED.

Howard N. Nugent, Jr., Esq.
Nugent Law Firm
P. O. Box 1309
Alexandria, LA 71309-1309
(318) 445-3696
Counsel for Plaintiff/Appellant:
    Joseph M. Bynog, Jr.

**Steven D. Crews**
**Corkern & Crews, LLC**
**P. O. Box 1036**
**Natchitoches, LA 71457-1036**
**(318) 352-2302**
**Counsel for Defendant/Appellee:**
**Michael Powers**

**Randall Brian Keiser**
**Keiser Law Firm**
**P.O. Box 12358**
**Alexandria, LA 71315-2394**
**(318) 443-6168**
**Counsel for Defendant/Appellee:**
**John Valenzuela**

GREMILLION, Judge.

The plaintiff, Joseph Bynog, Jr., appeals a judgment and a jury verdict finding that the defendant, Michael Powers d/b/a Powers Construction Company, was not at fault in causing him to suffer a severe fracture of his right leg and the ultimate loss of that leg. For the following reasons, we affirm.

**FACTS**

Bynog, a self-employed painter, was contracted to paint the interior of a new home owned by John Valenzuela, which was being built by Powers Construction. The home was located in Alexandria, Louisiana. Powers Construction employed the use of an air compressor, which was connected to the electrical source located outside the home. Air hoses were then run from the compressor to wherever the carpenters were working.

On October 14, 2004, Bynog and his son, Joseph Bynog, III, were painting in the house. Two employees of Powers Construction were nailing cornices on the back patio. Bynog was standing on a ladder and caulking nail holes when, allegedly, an air hose pulled against the bottom of the ladder and caused it to become unstable. To avoid falling and hurting his back, Bynog jumped to the floor. In doing so, his right foot landed on an air hose and rolled, resulting in a compound fracture of his tibia and fibula. Ultimately, Bynog's leg was amputated below the knee.

Bynog, his wife, and son filed suit against both Powers and Valenzuela. Valenzuela was later dismissed from the suit on a motion for summary judgment. The matter proceeded to a jury trial. At the close of the plaintiffs' evidence, the trial court granted a directed verdict in favor of Powers and dismissing the claims of Joseph

Bynog, III. After the close of evidence, the jury returned a verdict finding that Powers was not liable to Bynog and his wife in causing Bynog's injury. A judgment was rendered in this matter on June 27, 2007. This appeal by Bynog followed.

## ISSUES

On appeal, Bynog raises three assignments of error. He argues that the jury and trial court was manifestly erroneous in failing to find Powers negligent in causing his injury, in failing to award damages, and in failing to award loss of consortium damages.

## STANDARD OF REVIEW

The civil standard of review was laid out by the supreme court in *Detraz v. Lee*, 05-1263, p. 7 (La. 1/17/07), 950 So.2d 557, 561-62:

> Louisiana courts of appeal apply the manifest error standard of review in civil cases. *Hall v. Folger Coffee Co.*, 03-1734 (La.4/14/04), 874 So.2d 90. Under the manifest error standard, a factual finding cannot be set aside unless the appellate court finds that the trier of fact's determination is manifestly erroneous or clearly wrong. *Smith v. Louisiana Dept. of Corrections*, 93-1305 (La.2/28/94), 633 So.2d 129, 132. In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Id.*
>
> The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. *Id.*; *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217 (La.4/3/02), 816 So.2d 270, 278-79. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong, even if the reviewing court would have decided the case differently. *Id.*
>
> We have also consistently held that causation is a factual finding which should not be reversed on appeal absent manifest error. *Martin v. East Jefferson General Hosp.*, 582 So.2d 1272, 1276 (La.1991); *Smith v. State through Dept. of Health and Human Resources Admin.*,

2

523 So.2d 815 (La.1988).

## NEGLIGENCE

In his first assignment of error, Bynog argues that the jury and trial court was manifestly erroneous in failing to find Powers strictly negligent in causing his injuries. He claims that the presence of the air hose in the house created an unnecessary and dangerous defect that could have been prevented by suspending the hose off of the ground by one of several means.

Louisiana Civil Code Article 2317 provides:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This however, is to be understood with the following modifications.

Louisiana Civil Code Article 2317.1 states:

The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of a reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

In order to prevail on a negligence claim, Bynog must prove: (1) that the thing which caused his damages was in Powers' custody or control; (2) that it had a vice or defect which created an unreasonable risk of harm; (3) that his injuries were caused by the defect; (4) that Powers knew or should have known of the unreasonable risk of harm; and, (5) that the damage could have been prevented by the exercise of reasonable care, which Powers failed to exercise. *Conques v. Wal-Mart Stores, Inc.*, 00-619 (La.App. 3 Cir. 2/14/00), 779 So.2d 1094, *writ denied*, 01-0715 (La. 4/20/01),

3

790 So.2d 643. Failure to prove any one of these elements will defeat Bynog's claim. *Dauzat v. Thompson Const. Co., Inc.*, 02-989 (La.App. 5 Cir. 1/28/03), 839 So.2d 319.

In this instance, the jury held that Bynog failed to prove that the pulling of the air hose was a cause in fact of his falling off the ladder. After a review of the record in its entirety, we find that conflicting views of the evidence were presented to the jury as to the cause of Bynog's fall. The Bynogs presented evidence showing that a pull on the air hose by one of Powers' employees caused the ladder to become unstable and led to Bynog's decision to jump from the ladder rather than face injury from a fall. On the other hand, Powers presented evidence showing that the location of the air hose in conjunction with the ladder would lead to the conclusion that it could not have caused the fall in question. A summary of the evidence follows.

Bynog testified that he was standing on a six-foot ladder, puttying the nail holes on a door frame, when he felt the air hose hit the bottom of the ladder and start to pull it over. He stated that he jumped off the ladder when it became unstable because he did not want to risk injuring his back in a fall. In landing, Bynog stated that his right foot landed on the air hose, which caused his foot to roll and led to his injury. Although Bynog testified at trial that he felt the air hose hit the base of the ladder, he stated in his deposition that he neither saw nor felt it hit the ladder, just that he knew he fell.

Bynog stated that normally the air compressor, which provided pressure for the air hose, was located at the front of the house where the electrical source was located, as the house did not yet have electricity. However, on the day of his

4

accident, he testified that the compressor was moved from the front of the house to the garage, which was on the right side of the house. Thus, the air hose ran in a side door, around the edge of his ladder, and then out the back door of the house. Despite the fact that the petition stated that the compressor was located at the front of the house, Bynog testified at trial that it was located at the side of the house. He further stated that the air hose was already in place when he began working that day, and that air hoses were always present whenever the carpenters were working. Bynog denied falling from the ladder because he lost his balance. The ambulance and various hospital records state that Bynog fell off of the ladder in recounting the cause of his injury. Bynog explained that none of the health providers needed to know the actual cause of his accident. The first mention of the air hose occurred on May 3, 2005, in Dr. LeGlue's records, after he had hired counsel.

Joseph Bynog, III testified that he was assisting his father on the day of the accident. He stated that they were working in the living room of the house and that air hoses were lying across the floor at the time. He stated that Bynog was on a ladder puttying nail holes when, all of a sudden, the ladder became unstable. Joseph stated that upon looking down at the floor, he saw that the ladder's instability was caused by an air hose being drug across the floor. He said that Bynog then jumped from the ladder to the floor, injuring his leg. He stated that when Bynog was laying on the floor, he was lying across the air hoses.

Joseph testified at trial that he saw the air hose contact the bottom of the ladder. However, in his deposition, he stated that he saw the hose move, but did not really see it when it came into contact with the ladder. When asked about this

5

discrepancy, he stated that he did know that the carpenters were pulling on the hose at the time of the accident. In a January 2005 statement to an investigator, Joseph stated that he was watching Bynog at the time and that he guessed that the carpenter was pulling the hose because the ladder began shaking and then fell.

Joseph testified that the hoses were already present when he and his father arrived at the house and that the compressor was located out the front of the house. He first stated that the air hoses ran through the front door into the house and then out the back door. However, he then testified that he was unsure if the hoses entered the house from the front door, as he was certain that they ran along the french doors where his father's ladder was set up. He recalled stating in his deposition that he was unsure if they entered the house from the side or the front, but was sure that they exited the house through the back door. In his January 2005 statement, Joseph stated that the hoses entered the house from the front door. At trial, he stated that he was unsure if this was correct. He testified that if the hoses stretched along the french doors, as he knew they did, then he felt that they must have come from the side of the house, rather than the front door.

Joshua Wilson, Valenzuela's employee, testified that he was outside the house at the time of Bynog's accident. He stated that he heard screaming and went inside where he saw Bynog lying on the ground, the ladder turned over, and two air hoses nearby. Wilson stated that the compressor was located at the front of the house, where the electrical supply was located. He testified that two air hoses ran through the front door and then out the back door to the patio, where Powers' employees were working.

6

Wilson testified that the ladder had come to rest approximately one-half foot to a foot to the left of the air hoses. In his deposition, he stated that he felt that Powers had a sufficient length of hose to do his work in the house, but upon further reflection he did not believe that to be the case. He felt that the hose being pulled was the only thing which could have caused the ladder to fall. However, he admitted that he did not see the accident.

Powers testified that two of his employees were working at the site the date of Bynog's accident, Rossney Dupuy, his lead carpenter, and Brian Pennington. He said that his employees laid out the air hoses depending on where they were working at the time. He further stated that he advised the workers about pulling the air hoses so that they did not hit any finished walls.

Dupuy testified that on the date of the accident, he was working on the back patio, when he heard a noise and went inside. He stated that he saw Bynog lying on the floor and the ladder lying on its side approximately six feet from the back door, with its legs pointing toward Bynog. Up to that point, he testified that he did not think that anyone had pulled on the air hose. When he spoke to Bynog, he stated that Bynog told him that he lost his balance and jumped.

Dupuy testified that the electrical source for the house was located by the street, approximately 500 feet from the front of the house. He stated that the compressor was hooked to that power source and then the air hoses were run to the house. He said that he would not have moved the compressor to the side of the house because he would have been required to run extension cords from the power source to the compressor. Dupuy said that he was short of air hoses, so he ran the hose

7

through the front door and then out the back door to where he was working on the back patio. He said that the compressor was never placed by the garage because that area lacked a power source. He said he never considered doing this because running extension cords from the power source to the side of the house would have drawn down on the amperages run to the motor. He further stated that a feeder air hose was not run from the garage and then through the back door, which would have been along the rear of Bynog's ladder, as he had been working out back for approximately a week.

Pennington testified that on the date of Bynog's accident, the air hose was laid out by either him or Dupuy, the only workers that day. He stated that the compressor was located at the front of the house and that he believed that they were using only one air hose. He said that they were working on the ceiling in the back patio and had plenty of slack in the air hose such that they were not required to pull it. Pennington said that Bynog was working in front of the back windows, approximately seven to eight feet from the air hose. He stated that there should have been no air hose near his ladder as it ran in from the front door and then out the back door.

Pennington testified that he heard a noise in the house and went in to find Bynog laying on the ground and hollering that his leg was broken. He stated that the ladder was laying on his side, still open, and that the nearest hose was approximately six to eight feet from it.

After reviewing the record in its entirety, we find that it was reasonable for the jury to conclude that the action of one of Powers' workers in pulling the air

8

hose was not a cause in fact of Bynog falling off the ladder. The jury was presented with differing views of the evidence and it was reasonable for it to conclude that the compressor was located out the front of the house near the power source and that the air hose entered the house through the front door and then exited through the back door. In concluding so, the jury obviously discounted the testimony of Bynog and his son that the compressor was located off the side of the house, as no power source was located there. This is especially true, as Joseph stated that he was unsure of the location of the compressor, but that if it was located at the front of the house, then he could not imagine how the air hose could have caused the accident. In light of evidence in its entirety, we find that the jury's determination with regard to causation was entirely reasonable. Accordingly, the verdict of the jury and the judgment of the trial court as regards to causation is affirmed. That being our finding, we need not consider the final two assignments of error alleged by Bynog as they are rendered moot.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court finding that Michael Powers d/b/a Powers Construction Company is not liable for causing the accident suffered by the plaintiff-appellant, Joseph Bynog, Jr., is affirmed. The costs of this appeal are assessed to Bynog.

**AFFIRMED.**

**This opinion is NOT DESIGNATED FOR PUBLICATION, Uniform Rules—Courts of Appeal, Rule 2-16.3.**

9