646 So.2d 1152 (1994)
Michael MAHFOUZ, Plaintiff-Appellee,
v.
XANAR, INC., et al., Defendant-Appellant.
No. 94-305.
Court of Appeal of Louisiana, Third Circuit.
November 16, 1994.
Rehearing Denied January 18, 1995.
*1154 Anthony Fazzio, for Michael Mahfouz.
Gary McGoffin, Lafayette, for John Robichaux M.D.
Peter T. Dazzio, for Iberia Gen. Hosp.
Paul Joseph Hebert, for Hebert Sonnier Hebert.
Before DOUCET and PETERS, JJ., and BERTRAND, J. Pro Tem.[*]
PETERS, Judge.
The plaintiff, Michael Mahfouz, brought suit against a number of defendants to recover damages for a burn he received on September 12, 1988, while undergoing laser surgery at the Iberia General Hospital in New Iberia, Louisiana. Dr. John Robichaux, the defendant-appellant, removed a plantar wart from the ball of Michael Mahfouz's left foot with a Xanar XA-20 Carbon Dioxide Surgical Laser. As a result of the procedure, Mahfouz suffered a non-contiguous, unintended burn to the arch of his foot several centimeters from the surgery site.
Mahfouz brought suit against Xanar, Inc., Johnson & Johnson Company, and Coherent, Inc. as the manufacturers and sellers of the laser; St. Paul Fire & Marine Insurance Company, the liability insurer of Xanar, Inc. and/or Coherent, Inc.; Iberia General Hospital, the owner of the laser and the site of the surgical procedure; and Dr. Robichaux and his professional liability insurer, Louisiana Medical Mutual Insurance Company. The manufacturers were made cross-claim and third-party defendants by Dr. Robichaux and Iberia General Hospital. By trial, all claims had been either settled or dismissed except that of Michael Mahfouz against Dr. Robichaux and his professional liability insurer.
A bench trial was held on December 7 and 8, 1992, on the claim against Dr. Robichaux. After completion of the evidence, Mahfouz was awarded $470,837.51 in damages by the trial court which apportioned 25% fault to Dr. Robichaux, 35% fault to Iberia General Hospital, and 40% fault to Xanar, Inc. Dr. Robichaux appeals the finding of fault on his part and the award of damages.

FACTS
Michael Mahfouz saw Dr. Robichaux, who is a physician specializing in dermatology, because he was having pain associated with a plantar wart located on the ball of his left *1155 foot. After conservative treatment was not effective, Dr. Robichaux recommended surgical removal by use of a laser. The nature of the procedure required that it be performed in a hospital subject to either local or general anesthesia.
Mahfouz agreed to Dr. Robichaux's recommendation, and the laser surgery was performed on September 12, 1988, at the Iberia General Hospital in New Iberia, Louisiana. Iberia General made available to Dr. Robichaux its laser equipment which was the Xanar XA-20 Carbon Dioxide Laser. Additionally, the staff assisting in the procedure, Lorette Pittman, the circulating nurse, and Joyce Green, the surgery technician, were both employees of Iberia General Hospital.
The Xanar XA-20 Carbon Dioxide Laser functions by sending a carbon dioxide (CO2) laser beam through a series of tubes and mirrors referred to as an "articulated arm" to the target surface. The laser beam travels through the tubes and is reflected along its path by the mirrors to the "handpiece" where the beam is emitted. The CO2 beam vaporizes tissue at a focused spot without injury to adjacent tissue, but with immediate effect. The diameter of the beam and the amount of energy released is controlled by the operator of the laser, who thereby controls the diameter and depth of tissue removed.
Because the CO2 beam is invisible, the laser is equipped with a visible helium-neon guide beam to be used in conjunction with the CO2 beam. This guide beam, referred to as an "HeNe" beam, is aligned with the CO2 beam thereby giving the operator a visual sighting of the otherwise invisible CO2 beam. The alignment is accomplished by test firing the laser and using two adjustment knobs to coordinate the CO2 beam with the HeNe beam on an X-Y plane. Once the beams are aligned, an X-Y ring is locked down to maintain alignment.
The manufactures of the Xanar XA-20 Carbon Dioxide Surgical Laser provide purchasers of the system with an operation manual which provides in its introductory information that "THIS MANUAL SHOULD BE READ CAREFULLY AND IN ITS ENTIRETY BY ALL PERSONNEL ASSIGNED TO THE LASER OPERATING AREA" and that "THIS CARBON DIOXIDE LASER SYSTEM SHOULD ONLY BE OPERATED BY A TRAINED, QUALIFIED, AND LICENSED PHYSICIAN." When Iberia General Hospital acquired the laser, it held an in-service instruction seminar for the local physicians who might use the instrument. However, according to Dr. Robichaux who attended the seminar, the instruction was limited to detection of misalignment of the laser and not how to realign it. In fact, Dr. Robichaux never read the operation manual of this instrument.
At Iberia General Hospital, the standard procedure is for the surgery technician to bring all necessary equipment into the operating theater. The circulating nurse is then responsible for setting up and testing the laser. Once everything is in place, the patient is brought into the surgery room and the doctor is notified that everything is in order. Until the procedure begins the circulating nurse is in control. Thereafter, the doctor has all authority within the surgery theater.
The procedure itself is basically simple. The laser beam is directed at the designated area and the physician activates it by the use of a foot peddle. Visual contact is afforded the physician by various means. The Iberia General Hospital laser is equipped with a microscope which gives the physician detailed access to the area associated with the procedure but limits his field of vision as to the area around the surgery point. The depth and width of tissue vaporization is determined by the amount of energy released through the laser and the size of the beam. The narrower the beam, the greater the energy concentration is at that point. The physician combines these factors and the time of exposure to determine the degree of surgical intervention necessary to obtain a particular result.
To remove a plantar wart, the physician directs the laser at the wart and destroys some tissue. He then stops and curettes, or scrapes away, the burned tissue and examines the spot to determine if additional tissue should be removed. When curetting the surgical *1156 wound, the physician is not looking through the microscope or other vision limiting devise, but the entire area around the surgical site is visible. He continues to alternate the laser and curette activity until he is satisfied that the offending wart is completely removed. The physician then terminates the procedure and the nursing staff cleans and dresses the affected area.
Dr. Robichaux had used the laser at Iberia General Hospital on numerous other occasions before Mahfouz's procedure and was aware it was not trouble free. On at least two other occasions, he had experienced alignment difficulties during a procedure, and on one occasion, had to cancel a procedure because the HeNe beam would not function. However, all prior difficulties with the equipment were in no way similar to that which occurred on September 12, 1988.
On September 12, 1988, Ms. Green, as surgery technician, assimilated the laser, a microscope, a smoke evacuator, and all other equipment necessary for the procedure. She then assisted Ms. Pittman in setting up the equipment. She recalled that when it was initially test-fired by Ms. Pittman, there were two burn spots instead of one. Ms. Pittman again aligned the beams and test-fired it a second time. This time only one burn appeared. According to Ms. Green, she and Ms. Pittman then moved the machine into place for the surgical procedure. The patient was brought in and sedated, and Dr. Robichaux arrived to perform the procedure.
Although the testimony is in conflict as to time sequence, sometime during the procedure, a complication arose concerning the use of the laser. Ms. Pittman's recollection was that Dr. Robichaux complained toward the middle of the procedure that he was not able to align the HeNe and laser beams. She stated that "[t]o the best of my recollection, I think Joyce and I realigned the machine," and Dr. Robichaux continued his procedure. Ms. Pittman did not remember Dr. Robichaux testing the machine after it was realigned, but thought he would have been in a position to observe her testing for the alignment. She remembered that for some reason that day, they were rushed or in a hurry to complete the procedure. Ms. Pittman recalled that her attention was first drawn to the unintended burn at the very end of the procedure by the scrub technician who was dressing the foot. She remembered no one expressing an awareness of the unintended burn during the surgery. However, her duties during the surgical procedure kept her away from the actual operation.
Ms. Green's recollection of some of the events of September 12, 1988, is different from that of Ms. Pittman. Her position during the procedure was in close proximity to the patient as she was helping the doctor in the procedure. She recalled that another burn not at the surgical point was actually noticed toward the end of the procedure. She recalled that she and Ms. Pittman asked Dr. Robichaux if he wanted to stop and check the laser. She did not remember if Dr. Robichaux said yes or no but she did not recall that they stopped. According to Ms. Green, Dr. Robichaux saw the burn and made a comment about something being wrong, but did not stop. The unintended burn she noticed was approximately 7.5 centimeters, or slightly less than 3 inches from the surgery site. (1 inch=2.54 centimeters).
Jean Landry, the Director of Surgical Services for Iberia General Hospital, was informed by Dr. Robichaux after the surgery that he had a problem with the laser alignment during the procedure. Ms. Landry was also aware that periodically there had been an alignment problem with the hospital's laser. She immediately spoke with both Lorette Pittman and Joyce Green concerning what happened. According to Ms. Landry, Ms. Pittman informed her that during the procedure Dr. Robichaux had complained about the beams not being aligned; that she and Ms. Green asked Dr. Robichaux to stop and allow them to inspect the laser; and that he did not stop. Ms. Landry then test-fired the laser herself. In doing so she observed an expected spot burn at the target area but also noticed a small arching of the beam resulting in a burn approximately 0.5 to 1.0 inches up and to the right of the spot burn. She then checked the connections on the articulated arm and discovered the X-Y locking ring to be loose. After tightening the X-Y *1157 ring, she repeated the test procedure and observed that the arching beam disappeared.

EXPERT TESTIMONY CONCERNING CAUSATION
The trial court was presented with two theories as to the cause of the unintended burn. Dr. Cederic Walker, an expert in bio-medical engineering, testified that it was his opinion the most probable explanation for the unintended burn was inadvertent activation of the laser. Dr. John Fisher, an expert in bio-physics, testified and concluded that, in his opinion, the most probable explanation was that the burn was caused by a "dot and crescent" pattern emitting from the laser itself. The pattern, according to Dr. Fisher, was caused by failure to tighten the X-Y locking ring before activating the laser.
According to Dr. Fisher, the inadvertent burn was caused when the laser beam split as a consequence of it striking the inside of the microscopic adaptor immediately prior to exiting the laser. He explained that a part of the beam continued on as collimated light and vaporized the intended tissue at the sight of the wart, resulting in a "dot"-shaped burn as would have been expected had the laser been working properly. The other part of the split beam exited the articulated arm as a diffused beam and emitted an application pattern which appeared as a "crescent." Being diffused, the second beam covered a larger area, but with a significantly lower power density. Therefore, the tissue covered by the crescent beam was cooked rather than vaporized. Because of this cooking effect, the smoke normally expected from the laser's intense heat was not produced and the damage was not readily apparent.
The trial court concluded the inadvertent burn was caused by the "crescent" portion of the split beam and that the failure to tighten the X-Y locking ring on the laser created the damaging divergent beam. Because of this finding, it was necessary for the trial court to assess the comparative liability of all those involved in the incident despite the fact the other claims had been settled. The trial court concluded that the Xanar XA-20 Carbon Dioxide Surgical Laser was defectively designed and manufactured and unreasonably dangerous in normal use. In doing so, it assessed 40 percent of the fault to Xanar, Inc., the manufacturer of the laser. Iberia General Hospital was assessed with 35 percent of the fault for the plaintiff's damages as the custodian of the laser and as the employer of the nurse who negligently aligned the laser beams. The remaining 25 percent of fault was assessed against Dr. Robichaux.

OPINION
In a medical malpractice action against a physician, the plaintiff must establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care of physicians in his medical speciality and that a causal relationship existed between the alleged negligent treatment and the injury sustained. Louisiana Revised Statutes 9:2794 and Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991). Thus, a plaintiff must establish three things:
1. The degree of knowledge or skill a specialist is required to possess with regard to a particular procedure;
2. That the specialist either lacked the requisite knowledge or skill or failed to use reasonable care and diligence along with his best judgment in the application of that skill; and
3. That as a result of this lack of knowledge or skill or the failure to exercise the appropriate degree of care, the plaintiff suffered injuries that would not have otherwise occurred.
These are fact questions which should not be reversed absent manifest error. Martin, supra. With this criteria in mind, we will examine the evidence and the trial court's conclusions.
The evidence concerning the appropriate standard of care of dermatologists was provided by two board certified dermatologists, Dr. Elizabeth I. McBurney of Slidell, Louisiana, and Dr. Carlton L. Carpenter, of Baton Rouge, Louisiana. Both physicians had been members of the medical review panel which had concluded that Dr. Robichaux was without fault in causing the injury to Mahfouz. Based on the information before it at that time, the medical review panel had concluded *1158 that Mahfouz had been properly informed of the nature of the surgical procedure and had given an "informed consent"; that, given the failure of more conservative treatment, the laser procedure was appropriate; that Dr. Robichaux was not responsible for setting up the equipment for the procedure; that the surgical procedure was performed in an appropriate manner; and that the follow-up care was appropriate.

Informed Consent
The plaintiff contended at trial that Dr. Robichaux's treatment fell below the standard of care expected of dermatologists when he failed to warn his patient of the risk of the laser beam splitting and causing damage at an unintended spot. However, the trial court concluded the possibility of a split beam occurring was not a risk that Dr. Robichaux should have known about, and therefore his failure to disclose this possibility to Mahfouz did not constitute medical malpractice. We agree.
Louisiana Revised Statutes 40:1299.40(A) requires a physician to obtain a written consent from the patient for a surgical procedure. This document must set forth in general terms the nature, purpose, and known risks of the procedure. Additionally, it must contain a signed acknowledgment by the patient to the effect he has received the disclosure and all questions concerning the procedure have been answered in a satisfactory manner. The obvious purpose of this statute is to supply the patient with all available information which might influence his decision concerning the procedure.
Neither Dr. McBurney nor Dr. Carpenter had ever experienced a split beam in their use of lasers. Dr. McBurney was board certified as a dermatologist in 1975. She began using lasers in 1976 and was the first dermatologist in the Southern United States to do so. She currently teaches the principles of laser surgery at the LSU and Tulane Medical Schools in New Orleans, Louisiana, and during her practice has performed from 800 to 1,000 laser procedures and removed hundreds of plantar warts. Despite this experience, Dr. McBurney testified that prior to this case she was not aware that a laser could develop a split beam and thereby burn an unintended spot.
Dr. Carpenter became a board certified dermatologist in 1962 and has received training in laser surgery. He currently owns and uses a Xanar XA-20 Carbon Dioxide Surgical Laser. Prior to serving on the medical review panel in this case, he was not aware that a split beam might occur in laser surgery. According to Dr. Carpenter, neither Xanar nor any other industry representative ever informed him of even the possibility of such a phenomenon and he had never encountered such in his readings on the subject or at seminars.
Dr. Louis Mes, a Lafayette, Louisiana, plastic surgeon, treated Mahfouz for the injuries suffered as a result of the unintended burn. Although not a dermatologist, he also uses laser surgery in his speciality and was not aware of the split beam effect of a laser until his involvement in Mahfouz's treatment.
We agree with the trial court's conclusion that the split beam effect was not a risk Dr. Robichaux should have known about, that the procedure was accomplished with the patient's informed consent as required by Louisiana Revised Statutes 40:1299.40, and that Dr. Robichaux's actions in this regard did not deviate from the standard of care expected of dermatologists.

Appropriateness of the Procedure
No one argues that the laser procedure was inappropriate in this case. Mahfouz worked as a hair dresser and was required to stand throughout the day. Conservative treatment had failed, and the next medical consideration was laser surgery. Although not addressed by the trial court directly, we conclude that the selection of laser surgery as a form of medical treatment did not fall below the ordinary standard of care of physicians practicing in the dermatology speciality.

Equipment Setup and Testing
Physicians are responsible for their nurses' actions if the nurses acted within the immediate supervision and control of the physician. Grant v. Touro Infirmary, 223 *1159 So.2d 148 (1969); Pierre v. Lallie Kemp Charity Hospital, 515 So.2d 614 (La.App. 1st Cir.), writ denied, 515 So.2d 1111 (La.1987); Parker v. St. Paul Fire & Marine Ins. Co., 335 So.2d 725 (La.App. 2d Cir.), writ refused, 338 So.2d 700 (La.1976); and Parmelee v. Kline, 579 So.2d 1008 (La.App. 5th Cir.), writ denied, 586 So.2d 564 (La.1991).
As to the standard of care concerning setting up the equipment, both Dr. McBurney and Dr. Carpenter testified that the obligation to properly set up the equipment rests with the hospital staff, and not the dermatologist. According to Dr. Carpenter, when the physician is offered a piece of equipment for use it is the hospital's responsibility to see that it is properly working and not the physician's. To comply with the standard of care expected of dermatologists in this respect, according to Dr. Carpenter, the physician need only test the laser before beginning treatment. He personally does not check the various connections as that is the nurses' responsibility. Both physicians were of the professional opinion that the physician did not assume supervision and control until the procedure began.
Dr. Mes agreed that the laser is usually aligned by a technician before the doctor arrives in the operating room. His procedure is to take a test-shot and then begin the surgery if the laser appears aligned. He does not independently examine the connections and relies on the appropriate nurse for that procedure.
Jean Landry testified that at Iberia General Hospital the only thing expected of the surgeon is to test-fire the laser to ascertain that the beams are lined up and the laser appears to be functioning properly. They are not expected to do anything else as the obligation to set up the equipment for surgery is a function of the hospital staff.
The trial court concluded that the nurse who failed to tighten the X-Y locking ring was not acting under the immediate supervision and control of Dr. Robichaux and therefore he was not legally responsible for her actions. However, the trial court did conclude that Dr. Robichaux was negligent in not personally ascertaining that the laser was fully operational and free of defects before surgery and by not being familiar with the safety precautions recommended by the laser manufacturer. We cannot agree with this finding. The test to be applied is that of the standard degree of care of a physician in a dermatology speciality. Martin, supra. The record is void of evidence that the appropriate standard of care would require a personal inspection of the laser. In fact, all the evidence is to the contrary. Additionally, although the physicians suggested it would be helpful to be familiar with the operation manual, nothing in the manual would have warned of the phenomena which occurred herein. In medical malpractice actions to determine whether the physician possessed the requisite degree of skill and knowledge or failed to exercise reasonable care and diligence, expert witnesses who are members of the medical profession are necessary sources of proof. Martin, supra.
Therefore, we conclude the trial court was clearly wrong in this regard. However, for the reasons set forth hereafter, we conclude the judgment should be upheld.

Surgical Procedure
Sometime during the procedure, problems with the laser became apparent to Dr. Robichaux, Ms. Pittman and Ms. Green. According to Ms. Pittman, Dr. Robichaux complained during the middle of the procedure that he could not align the beams. Ms. Green recalled the episode to be near the end of the procedure. Ms. Green recalled that Dr. Robichaux did not allow the nursing staff to realign the beams, but continued the surgery. Although Ms. Pittman now recalls that they stopped the procedure, Ms. Landry testified that immediately after the surgery, Ms. Pittman told her Dr. Robichaux refused to stop and allow her to inspect the laser. The trial court found as fact that "[d]uring the surgery, a nurse noticed the burn and told Dr. Robichaux. Dr. Robichaux refused to stop the surgery to realign the laser. Dr. Robichaux's careless disregard for his patient's safety proximately caused Mr. Mahfouz's injury." Although the testimony is in conflict on this point, where there is a conflict in the testimony, reasonable evaluations of *1160 credibility and reasonable inferences of fact should not be disturbed upon review. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Although Dr. Robichaux had no duty to inspect the equipment prior to surgery, once a problem arose with the equipment during surgery he had a duty to stop the procedure, ascertain the problem and correct it if possible. This duty is all the more necessary given the nature of the equipment in use. According to Dr. McBurney, laser surgery is classified by the ANSI Standards as a Class 4 "High Risk-High Technology" procedure. Because of the nature of the activity, it is imperative that extra precautions be taken to protect the patient as well as the other individuals present. Some of those precautions include:
 The use of nonflammable surgical drapes to protect the area not subject to the surgery from an inadvertent activation of the laser;
 Keeping even the nonflammable surgical drapes adjacent to the surgical point wet to reduce further the possibility of combustion and/or inadvertent burn;
 The use of safety glasses by everyone within the operating theater to protect from the possibility of the laser beam being diverted or deflected into someone's eye;
 Placing a sign on the entrance of the operating theater signifying a laser is in use, and supplying safety glasses at the entrance in the event anyone was required to enter;
 The use of a devise to quickly remove the buildup of smoke in the operating theater which is created by the extreme heat generated by the laser in use;
 Removal of all jewelry from the patient and others to avoid the possibility of laser beam deflection from a shiny surface in an improper direction; and,
 Using a nonflammable anesthetic.
At trial, Dr. McBurney stated that "[y]ou want to also be sure that your equipment is properly working, that you have the power setting that you want, that your spot size is appropriate for what you want to do. And you do a test on a nonflammable preferable object."
When they rendered the decision on the medical review panel, both Dr. McBurney and Dr. Carpenter understood that Dr. Robichaux was unaware of any problems associated with the procedure until after the surgery was completed. Both testified that if he were aware of a laser malfunction, an unintended burn, or anything out of the ordinary, he should have stopped. In fact Dr. Carpenter could not understand how one would be unaware of a burn of this magnitude. He stated that "Every time my laser fires, I can see what it's doing. And how I could be working here and having this much damage occur over here without my knowing it just boggles my mind."
Those who are entrusted with the care of an unconscious or helpless patient owe a duty of care which includes the duty to furnish defect free equipment. Holliday v. Peden, 359 So.2d 640 (La.App. 1st Cir.1978). Once Dr. Robichaux determined a problem existed with the laser, he owed a duty to Mahfouz to immediately ascertain the problem and correct it or terminate the procedure. In this case, he did neither. As the person in charge of the operating theater, he could not delegate this responsibility and avoid liability. It is for just such a circumstance that the surgeon should be familiar with the operating manual and have the ability to personally ascertain that the safety precautions recommended by the manufacturer were followed.
When the laser was tested by Ms. Pittman before the procedure began, it might well have been properly aligned. The X-Y locking ring was designed to maintain alignment after testing. Without the ring being tightened, the movement of the laser into place could easily have caused the split beam. Additionally, each time Dr. Robichaux stopped to curette the surgical wound the opportunity to cause the split beam by movement existed. Each time Dr. Robichaux scrapped the surgical wound, the entire bottom of the foot was visible to him and the cooking effect of the crescent beam could have been noticed. When Jean Landry test-fired the laser after the malfunction had been reported to her she immediately noticed the dot and crescent *1161 pattern. As soon as she tightened the X-Y locking ring, it disappeared.
We find that Dr. Robichaux had the degree of knowledge or skill which should be possessed by a dermatologist with regard to this particular procedure but failed to use reasonable care and diligence or judgment in not stopping the procedure and ascertaining and correcting the laser malfunction. We also find that this failure caused Michael Mahfouz to suffer injuries that would not otherwise have occurred.
In reaching this conclusion, we find no manifest error in the trial court's findings of percentage of liability.

DAMAGES
The trial court awarded Mahfouz $57,189.00 for past lost wages; $167,315.00 for future loss of income as a hair stylist; $65,000.00 for future loss of income from an aerobics studio; $20,000.00 for future loss of income from a cosmetology school; $6,333.51 for past medical expenses; $5,000.00 for future medical expenses; and $150,000.00 for pain and suffering for a total award of $470,837.51. On appeal, Dr. Robichaux contends that the trial court erred in awarding any damages for future loss of income for the aerobics studio and the cosmetology school and that the court awarded excessive damages for past and future lost earnings as a hair stylist. He does not contest the amount of the remaining awards.
At the time of the laser surgery, Mahfouz was 37 years old and was the owner and operator of the Salon, a hairdressing establishment in Abbeville, Louisiana. His education included two years of general studies at the University of Southwestern Louisiana, nine months at a beauty school in Alexandria, Louisiana, and six weeks at the Vidal Sassoon Academy in San Francisco, California.
After the accident, Mahfouz sought treatment from at least six doctors and was also seen by Dr. McBurney. On October 11, 1988, he first saw Dr. Mes who became his treating physician for the burn and its effects. In April of 1991, Dr. Mes attempted to cut the nerve endings under the skin at the burn site to alleviate the pain, but the surgery was unsuccessful. After the surgery, he continued to follow Mahfouz and administered a cortisone treatment which was also unsuccessful. An orthopedic device in the shoe and physical therapy were also unsuccessful. Dr. Mes ultimately concluded that Mahfouz sustained a 50 percent permanent disability of the left foot as a result of the unintended burn.
Because of his disability Mahfouz has difficulty walking and standing for long periods of time. He is flatfooted and because the burn is in the arch of the foot, the pain is constant. In attempting to adjust by walking on the outside of the foot, he has developed ankle, knee, and back difficulties as well. Balance has also been a problem as a result of his adjustments in walking and standing.
The injury has destroyed his ability to earn a living as a hairdresser and he has sustained an economic loss as a result. The trial court awarded past and future loss of income based on the presumption that Mahfouz is employable only at minimum wage employment from the date of the injury through his life expectancy. Before an appellate court can disturb a quantum award, the record must clearly reveal that the fact finder abused its discretion. Veazey v. State Farm Mutual Auto Ins., 587 So.2d 5 (La. App. 3d Cir.1991). The trial court's award may not be modified unless it is unsupported by the record. Id. We cannot conclude that the trial court abused its discretion in awarding past and future loss of wages.
However, the award for future loss of income associated with the aerobics studio and the possible cosmetology teaching career are speculative at best. The aerobic studio was opened after the accident and closed primarily because Abbeville was not large enough to economically sustain such an endeavor. Additionally, nothing in the record establishes anything more than the idea that Mahfouz might in the future consider a teaching career. In any event, we consider an award for both loss of future income as a hairdresser and loss of future income as a cosmetology teacher to be duplicative. Thus, we find that the trial court erred in awarding damages for *1162 loss of future income in this regard. This award is set aside.

DISPOSITION
For the foregoing reasons, we set aside the awards for future loss of income associated with the aerobics studio ($65,000.00) and the cosmetology teaching career ($20,000.00). We affirm the judgment in all other respects and assess costs of this appeal to Dr. John Robichaux.
AFFIRMED IN PART; REVERSED IN PART.
NOTES
[*] Honorable Lucien Bertrand, Jr., participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.