| iMARVIN, Chief Justice.
In this medical malpractice action arising out of an ulnar nerve injury discovered shortly after abdominal surgery under a general anesthetic, the surgeon, the anesthesiologist and the hospital (vicariously liable through its circulating nurse) appeal a judgment based on a jury verdict awarding the patient plaintiff monetary damages and allocating fault between the respective defendants.
The issues, which are essentially factual, concern the standard of care owed the patient by each respective defendant, whether the respective standard was breached by that defendant to cause plaintiffs injury, and the jury’s allocation of fault: 70 percent to the anesthesiologist, 20 percent to the surgeon, and 10 percent to the hospital. The quantum of the judgment ($124,200) is not an issue in this appeal.
The trial court denied defendants’ motions for JNOV and a new trial. Finding no clear error, we affirm. Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991).
PREFACE
Defendants are the general surgeon, Dr. Daniel Sartor; the anesthesiologist, Dr. Philip R. Warren; and the hospital, as the employer of the “circulating nurse” in the operating room, one of three nurses who assisted with the surgery. The conduct of the other two nurses, the scrub nurse and the surgical assistant, is not at issue.
Defendants urged that the standard of care for preventing an ulnar nerve injury during surgery was followed in all respects and that the injury to the nerve in Robertson’s right arm could have occurred “innocently,” and without malpractice, from normal events such as tissue swelling in plaintiffs elbows while his arms were immobilized during surgery and IV fluids were being administered in his left arm. |2The doctors also suggested that plaintiffs injury may have occurred either in the recovery room or the hospital room after plaintiff was removed from the operating room.
By assessing some fault to each of the defendants, the jury obviously concluded the injury occurred in the operating room. No defendant disputes on appeal that the injury occurred in the operating room, but each reiterates that the evidence was insufficient to prove the respective standard of care was breached during the surgery.
FACTS
Plaintiff Edward Robertson’s abdominal surgery was performed on July 3, 1987, at the North Monroe Community Hospital to repair a hiatal hernia, or protrusion of part of the stomach into the esophagus. The hernia caused him to experience episodes of gas-troesophageal reflux, or movement of stomach contents up the esophagus and into his windpipe, which in turn caused bronchial spasms and severe breathing difficulties.
The surgical procedure, called “Nissen fun-doplication,” was performed on Robertson’s upper abdomen, in the area between the lower end of his breastbone and his navel. Dr. Sartor repositioned the portion of Robertson’s stomach that was protruding into his esophagus, successfully eliminating the reflux condition.
During the surgery, Robertson’s arms rested on arm boards extending outward from each side of the operating table. Dr. Sartor stood at Robertson’s right side, very near the right arm board, throughout the *1267 surgery, which took about an hour and 20 minutes. Robertson was under general anesthesia, administered and monitored by Dr. Warren, for about two hours.
laSoon after being returned to his hospital room from the recovery room Robertson noticed some numbness and tingling in the outer portion of his right hand, which he did not have before the surgery. He immediately reported this to several members of his family, who obtained additional pillows from a floor nurse to place under Robertson’s right arm.
Several days later, after the effects of the anesthesia had fully worn off, Robertson still had numbness in the fourth and fifth fingers of his right hand. According to the medical records, he reported this to Dr. Sartor on July 8,1987, five days after the surgery. Dr. Sartor told Robertson that this was not uncommon after surgery and would likely clear up on its own. Dr. Sartor told Robertson to avoid putting pressure on his elbows and instructed the floor nurses to periodically monitor Robertson’s position in the hospital bed.
Robertson was discharged from the hospital on July 10,1987. He continued to experience numbness in his right hand and a gradual weakening of the muscles in that hand. He consulted Dr. Joseph Wapenski, a Monroe neurologist, in September 1987, reporting that his symptoms appeared shortly after the abdominal operation.
Dr. Wapenski ordered nerve conduction studies which confirmed an ulnar nerve injury but did not show precisely where the nerve was being compressed. Blood and other tests by Dr. Wapenski ruled out diabetes or other possible medical causes of an ulnar nerve injury. Robertson’s ulnar nerve condition did not improve with physical therapy.
In May 1988, Robertson saw Dr. Gerald Randle, a neurologist in Jackson, MS, whose tests showed that the right ulnar nerve was compressed at the elbow. Robertson thereafter consulted Dr. Lynn Stringer, a Jackson neurosurgeon, who 14performed corrective surgery in June 1988, almost a year after the abdominal surgery.
Dr. Stringer removed some sear tissue from the ulnar nerve in Robertson’s right elbow and transposed the nerve to a more favorable location, partially restoring some of the nerve function, but leaving Robertson with some permanent numbness and loss of strength in his right arm and hand.
Dr. Stringer did not notice any anatomical abnormalities in the area of Robertson’s elbow that might have made him particularly vulnerable to an ulnar nerve injury from the normal events of the abdominal surgery, as defendants urged. Defendants’ contention that Robertson’s work as an electrician may have predisposed him to an ulnar nerve injury during the surgery, without any malpractice having occurred, will be discussed infra.
The presence or absence of a predisposing factor does not heighten or enervate the applicable standard of care for protecting a patient’s arms from ulnar nerve injury during surgery, but relates solely to the issue whether Robertson’s injury occurred even if the standard of care was met in the operating room.
EXPERT TESTIMONY
Dr. Stringer, the neurosurgeon, was one of Robertson’s experts. Robertson’s neurologists, Drs. Wapenski and Randle, testified for the defendants, along with Dr. David Kline, a New Orleans neurosurgeon. Robertson’s other experts were two anesthesiologists: Dr. Mervyn Jeffries of Washington, D.C., and Dr. Brian McAlary of Baltimore, MD. The two defendant doctors, Sartor and Warren, gave both fact and expert testimony.
The medical witnesses agreed that any patient who undergoes abdominal surgery under general anesthesia must have his or her arms positioned and padded in | sa certain way to prevent injury to the nerves in the arm, including the ulnar nerve, which runs from the neck through the arm and into the outer portion of the hand, supplying feeling and muscle control to the fifth (little) and part of the fourth (ring) fingers of hand.
The ulnar nerve generally runs well below the surface of the skin in the arm. At the elbow, however, the nerve passes through a narrow channel or groove where the bones of *1268 the upper and lower arms meet and is near the surface of the skin. The ulnar groove is on the inner side of the elbow when the hand is placed with the palm up, as Robertson’s was during the surgery. Very little soft body tissue, or natural cushioning, surrounds the ulnar nerve at the elbow. The ulnar nerve often causes pain in a person’s arm when the ulnar groove in the elbow (or “funny bone”) is struck on a hard object.
During a surgery such as Robertson’s, the ulnar nerve is vulnerable to foreseeable injury in at least two ways: Either by being stretched excessively in the shoulder area, if the patient’s arms are placed at an angle of more than 90 degrees from his torso, or by being too long compressed between the bony groove in the elbow and another hard surface, such as the operating table or the arm board that extends from the table.
Although one of Robertson’s expert witnesses opined that a stretching injury may have occurred, the record suggests that Robertson’s arms were initially placed at an angle less than 90 degrees from his body and that the boards on which his arms rested were securely clamped to the operating table and could not have been inadvertently moved upward during the surgery.
Most of the expert testimony on both sides focused on the issue whether Robertson’s ulnar nerve was or could have been compressed at the elbow during the | (¡surgery. Compression of the ulnar nerve reduces the blood supply the nerve receives and may permanently injure the nerve if the compression persists for more than 15 minutes.
The experts explained that a person whose ulnar nerve is compressed, during daily activities or even during normal sleep, will soon feel pain in the arm and reposition it to remove pressure from the nerve, relieving the pain and restoring blood flow to the nerve. A patient under general anesthesia cannot feel the pain or move his arm. One or more members of the surgical team must therefore protect the anesthetized patient from ulnar nerve compression by properly positioning and padding the arm before anesthesia, and by monitoring the arm position to observe and correct any changes that may occur during anesthesia.
Robertson’s surgical team included Drs. Sartor and Warren, and the circulating nurse, whose duties included assisting the doctors with positioning Robertson on the operating table, charting pertinent details of the surgery in the hospital records, and moving about the operating room to assist the members of the surgical team whose movement is limited during the surgery.
The experts agreed that the responsibility for properly positioning and padding Robertson’s arms before the surgery began was shared by the surgeon, the anesthesiologist and the circulating nurse. Once surgery begins, however, the surgeon is expected to focus his full attention on the surgical procedure and has no duty to monitor the patient’s arms, which, along with all other parts of the body not involved in the surgery, are covered with surgical drapes. The drapes he flat over most of the patient’s body but extend upward near the head, hanging from portable metal poles placed on either side of the head of the operating table, to ahow access to the anesthesiologist.
|7The pole on Robertson’s left side served the dual purpose of supporting the drape and holding packets of various fluids that were administered to Robertson intravenously during the surgery through a needle in his left arm. A blood pressure cuff was placed on Robertson’s right forearm for the anesthesiologist’s use.
After putting the patient to sleep, the anesthesiologist sits or stands at the patient’s head throughout the surgery, constantly monitoring his vital signs (breathing, heart rate, blood pressure, etc.) and the effectiveness of the anesthetic agents, which keep the patient unconscious and immobile during the surgery. Because the anesthesiologist’s position at the head of the operating table gives him a better view of the patient’s arms than have other members of the surgical team, the anesthesiologist has the affirmative duty of monitoring the arm position throughout the surgery and correcting it, if necessary, to prevent compression of the ulnar nerve.
The circulating nurse freely moves about the operating room, and may sometimes exit the room, during the surgery. While this *1269 nurse is not required to periodically monitor the patient’s arm position, she is required to report to one of the doctors any obvious change in arm position that she happens to observe in the course of “circulating” in the operating room, according to the experts.
ARM POSITION
The experts agreed that certain aspects of Robertson’s initial arm position were clearly within the applicable standard of care for preventing a compression injury of his ulnar nerve: his palms were facing up, and the arm boards on which his arms rested were padded with a soft material and covered with vinyl. Additional padding between his arms and the arm boards was provided by placing a foam rubber “egg crate” cushion under each of his arms. The cushion, sometimes called | san elbow protector or elbow pad, is about 15 inches long and widens from three inches on each end to about six inches in the middle, where the elbow rests.
Two aspects of the initial arm position were questioned at trial: the angle at which the arm boards were extended from the operating table, and the use of velcro arm straps to secure Robertson’s wrists to the arm boards. Because these details were obviously significant to the jury’s resolution of the standard of care and cause-in-fact issues, we shall discuss them.

Angle of Arm Boards

The experts generally agreed that if the patient’s arms are extended away from the operating table, as Robertson’s were to afford Dr. Sartor optimum access to the surgical site in his upper abdomen, the angle of extension should be no greater than 90 degrees, to prevent prolonged stretching of the nerves at the shoulder area.
The experts agreed that when the arm boards are positioned at less than 90 degrees, as they apparently were here, they should be placed in a manner that will allow the surgeon who stands at the patient’s side adequate room for performing the surgery. The lower limit of the acceptable arm board angle was not quantified by any expert witness.
The exact angle at which Robertson’s arms were extended during the surgery was not recorded, nor required to be recorded, in the medical records. The angle was estimated by various members of the surgical team at about 45 degrees (in drawings by the anesthesiologist and the circulating nurse, attached to their discovery depositions that were taken within 18 months of the July 1987 surgery), about 65-75 degrees (in the anesthesiologist’s deposition testimony) and at about 85 degrees in a videotaped “reenactment” of Robertson’s surgical position that the 1 gdefendants filmed, with a hospital employee posing as the patient, about five years after the surgery.
The circulating nurse testified at trial that her earlier drawing of the arm boards at a 45 degree angle was “vague” and “approximate,” telling the jury, “that [angle] would not be correct because the surgeon would not have room to stand and operate.” According to Dr. McAlary, one of Robertson’s experts, placement of the arm boards at a 45 degree angle, as depicted in Dr. Warren’s drawing, “would reduce the space that the surgeon had to work in considerably, making it much more likely that the surgeon ... would be pressing on this patient’s arm or causing the arm to be ... turned a little bit on the arm board[.]”
The experts on both sides agreed that when the surgeon stands near an arm board during surgery, he may inadvertently lean against the board and change the position of the patient’s arm. According to most of the expert witnesses, including those for the plaintiffs, the surgeon’s inadvertent movement of the arm would not be considered “wrong” or substandard conduct on the surgeon’s part, but should be noticed and quickly corrected by the anesthesiologist. The only contrary opinion came from defendants’ neurosurgeon, Dr. Kline, who opined that it would be below the standard of care for the surgeon to lean against the arm board, even inadvertently, except in an emergency situation where the surgeon makes contact with the arm board in the course of rendering treatment to save the patient’s life.
Robertson’s surgery was routine and presented no emergencies. Dr. Warren testified *1270 that Robertson received twice the usual dosage of muscle relaxing drugs before surgery because the surgical site in which Dr. Sartor would be working was fairly small, and any movement of his muscles could restrict the surgeon’s working |¾ parea. The experts agreed that with this dosage of medication, Robertson simply could not have moved his own arm, even slightly, during the surgery.
Dr. Sartor told the jury that he was “close to the right arm board” during Robertson’s surgery, even with the boards at almost a full 90 degree angle, as depicted in the defense videotape and still-photo reproductions therefrom. Dr. Sartor denied having made any contact with the arm board during Robertson’s surgery, explaining that he would have moved down toward Robertson’s feet and not up or out toward his right arm if any movement was required to improve his view of, or access to, the surgical site. The scrub nurse, who stood on Robertson’s right side between Dr. Sartor and Robertson’s feet, had no recollection of the surgery, according to a stipulation between the litigants.
The angle at which the arm boards were placed was factually significant, not only with respect to their proximity to the surgeon, but also in terms of how their placement affected the anesthesiologist’s ability to monitor Robertson’s arm position during the surgery. Even with the arms at almost a full 90 degree angle, as depicted in the defense video, the anesthesiologist’s view of the patient’s right arm, from just above the elbow to the wrist, is partially obscured by the drape covering the patient’s upper body. Placement of the arm boards closer to the patient’s body would obviously have obscured Dr. Warren’s view of Robertson’s arms even more.
Dr. Warren testified that he had a good view of Robertson’s arms at all times, and could have easily moved the drape if it interfered with his ability to observe any change in the arm position. The jury also heard from Dr. Warren, however, extensive details of the various anesthetic agents and technically sophisticated equipment he used and frequently monitored to keep Robertson alive, but unconscious and immobile, during the surgery.
| ii Resolution of the factual issues (How close were the arm boards to Dr. Sartor? How much of Robertson’s arms could Dr. Warren easily see while he was performing his other duties?), and of the corresponding breach of duty issues with respect to each defendant, was within the jury’s province.

Arm Straps

The circulating nurse and the defendant doctors testified that one of them, although they could not recall which one, placed velcro arm straps at the lower end of each arm board, near Robertson’s wrists, before the surgery began, to keep his arms from being moved off the padded boards. The operative record written by the circulating nurse, on a printed form or questionnaire, shows that the “egg crate” elbow pads, heel pads and a safety strap across Robertson’s thighs were used to position and secure Robertson on the operating table. The operative record does not show that safety straps were used on Robertson’s arms.
The circulating nurse and her nursing supervisor testified that the use of arm straps during surgery is not always charted, and that the omission of a notation in the chart does not mean the arm straps were not used. The surrogate patient in the defense video has arm straps at his wrists.
Defendants categorically argue even if the jury chose to believe the arm straps were not used, in the face of testimony from members of the surgical team that they were used, there is no evidence that the use of arm straps is required by the applicable standard of care. The record is not that categorical, as we shall explain.
Robertson’s expert anesthesiologist, Dr. McAlary, opined that the use of arm straps is generally optional rather than mandatory when the patient is lying flat, as Robertson was, with one exception: “If there’s anything unique about the procedure hgthat increases the risk of [moving] that arm then restraining that arm with a safety device is indicated.”
Narrating the video reenactment of Robertson’s surgical position, Dr. Sartor clearly told the jury:
*1271 This demonstrates ... what we are expected to do ... to position and pad a patient. And with respect to the ulnar nerve, ... it shows the padded arm boards, the arm out on the arm board less than ninety degrees. It has a palm up position, and it has wrist straps. Now, that’s the generally accepted, quote, “Standard of Care.”
... This is the safety strap [on the arm], and I insist on the safety strap. I don’t start surgery without those safety straps. I’m kind of paranoid about that....
Q. Is there a reason, Dr. Sartor, why ... you know for sure you in this case made the special effort to double check to make sure [Robertson] was properly positioned and padded?
A. Well, ... I knew what kind of operation I was going to have to do. And I know that sometimes in an operation such as the fundoplication when you have to see way up that upper abdomen, occasionally you have to put the head down a little bit. I wanted to make sure that all those straps were there so that nothing could move in this little minor ... head down position. (Our brackets and emphasis.)
Although it does not appear that Robertson’s head was moved downward during the surgery, Dr. Sartor’s awareness of that possibility before surgery began was factually significant to the jury’s assessment of Dr. MeA-lar/s testimony with respect to whether the use of arm straps was required in Robertson’s case.
Dr. Warren was also asked about the standard of care for protecting an anesthetized patient from an ulnar nerve injury:
Q. And the standard involves the padding on the arm boards and the egg crate [elbow pads], and of course proper placement?
A. And the wrist strap also. (Our brackets and emphasis.)
In the face of this testimony from the defendant doctors, the jury could have reasonably concluded that the applicable standard of care required the use of arm 113straps to secure Robertson’s wrists to the arm boards. Likewise, the jury could have reasonably concluded as a fact that arm straps were not used on Robertson, notwithstanding defendants’ testimony to the contrary.
The experts agreed that if arm straps are used, they should be placed loosely around the patient’s wrists, in a manner that will keep the arm from falling off the arm board if the arm is moved, but will not constrict or place pressure on the arm while it is immobile. Drs. Sartor and Warren testified that this is how the straps at Robertson’s wrists were placed.
No witness testified that Robertson’s right arm fell off the arm board during the surgery. According to plaintiffs’ experts, however, Robertson’s arm position could have been changed or moved during the surgery in a manner that compressed his ulnar nerve between his elbow and the inner edge of the arm board for at least 15 minutes, even if the arm straps were used.
Drs. Sartor and Warren testified that no such change or movement occurred.
The jury heard this testimony from plaintiffs’ expert anesthesiologist, Dr. McAlary:
Q. You’ve been involved in situations before ... at your own hospital [in Baltimore] where an injury to the ulnar nerve has occurred and the anesthesiologist said, ‘We did everything right,” is that not correct?
A. Yes.
Q. And you’ve investigated that situation?
A. Yes. ... In most cases, by talking to ... other allied personnel who were in the operating room and weren’t responsible for positioning but happened to notice things ... we were able to [document] a positional problem even though the anesthesia provider was quite confident that there wasn’t one_ (Our brackets.)
JuPREDISPOSITION
Dr. Stringer, the neurosurgeon who operated on Robertson’s elbow in 1988, testified that Robertson, then age 65, had no anatomical abnormalities in his elbow or medical conditions that would have made him particularly susceptible to an ulnar nerve injury during the 1987 abdominal surgery. Defendants and their experts opined, however, that Robertson’s work as an electrician for over *1272 40 years may have caused repeated minor injuries to his ulnar nerve, making it vulnerable to becoming symptomatic during the surgery even if no malpractice occurred.
The experts on both sides generally agreed that a person’s ulnar nerve can suffer cumulative “insults” or minor injuries from being compressed at the elbow during work or everyday activities, each of which may cause a small amount of internal bleeding, but no residual effects, such as numbness or tingling in the hand. Scar tissue then forms where the internal bleeding has occurred, and gradually reduces the already narrow space in the elbow groove through which the ulnar nerve passes. If enough scar tissue accumulates over time, the nerve may become entrapped in the elbow groove and a seemingly innocent event or relatively minor amount of compression may trigger the onset of numbness and tingling in the hand.
Even the defense experts, however, did not consider an electrician to be any more susceptible to recurring minor elbow injuries than other blue-collar, or even many white-collar, workers, who often rest their elbows on hard surfaces.
The defense experts testified that a person who is predisposed to an ulnar nerve injury, but asymptomatic before surgery, could experience his first symptoms of the nerve injury after surgery, as a result of normal events that occur during surgery which do not constitute malpractice. According to these experts, the mere fact that the arm is immobilized for an hour or more will cause some tissue swelling 115m the elbow. The IV fluids the patient receives during surgery may increase the swelling. Additional pressure may be placed on the ulnar nerve from the weight of the patient’s arm resting on the arm board during the surgery, even though the board is adequately padded.
Two of plaintiffs’ experts, Drs. McAlary and Stringer, agreed on cross-examination that an injury to the ulnar nerve during surgery, without any malpractice, is “technically possible but highly improbable.” (Our emphasis.) Plaintiffs’ other expert, Dr. Jef-fries, steadfastly maintained that the ulnar nerve simply will not be injured during surgery if the patient’s arms are properly positioned, padded and monitored, even if the patient is predisposed to a nerve injury in some way.
The opinion testimony of plaintiffs’ experts that an ulnar nerve injury rarely occurs from the normal events of surgery was factually substantiated by both Dr. Jeffries, who has administered or supervised the administration of anesthesia to about 35,000 patients in his 40-year career, and by Dr. Sartor, who has operated on over 16,000 patients in more than 35 years of general surgery practice. To the best of the doctors’ knowledge, none of Dr. Jeffries’ patients, and none of Dr. Sartor’s except possibly Mr. Robertson, has suffered a permanent ulnar nerve injury from “innocent” events in the operating room.
Defendants’ expert, Dr. Kline, has taught and practiced neurosurgery at LSU Medical School in New Orleans since 1967 and has chaired the neurosurgery department there since 1976. Of the many thousands of surgeries he has performed on injured nerves in various parts of the body, about 400 have involved ulnar nerve entrapment at the elbow. Dr. Kline said most of these patients could identify no particular event or trauma as the cause of their injury.
| ifiDr. Kline estimated that about 10 or 15 of the 400 patients, or less than five percent, first noticed symptoms of the ulnar nerve injury after having had surgery on another part of their body. Based on the information Dr. Kline obtained from either or both the referring surgeon and the patient, Dr. Kline was aware of the possibility of medical malpractice in only two of these 10-15 cases. He opined that the other patients whose ulnar nerve injury first manifested after surgery had an anatomical, medical or occupational factor that predisposed them to the injury from the normal events of surgery.
According to Dr. Stringer, the neurosurgeon who performed the corrective surgery to reposition Robertson’s ulnar nerve, Robertson was not anatomically or medically predisposed to an ulnar nerve injury. Dr. Stringer opined that most patients whose ulnar nerve is compressed by repeated past minor traumas at work have a gradual onset *1273 of symptoms, such as numbness or weakness in the hand, which eventually become significant enough for them to seek medical attention. Dr. Stringer gave these reasons for his opinion that Robertson’s nerve injury did not occur in this way:
This man is an electrician, uses his right hand every day. He was having absolutely no trouble with it [before the abdominal surgery]. He goes in, has his surgery, and, from what he tells me, when he woke up from the surgery, he noticed the problems with his hand. And the most likely source of this ulnar nerve problem is some type of intra-operative injury.
Q. And that would not be consistent with the type of injury which would occur gradually or imperceptibly over time, which would have symptoms occurring over time; is that correct?
A. As I’ve said [in answer to] prior questions on all of this [by defense counsel], any of this is possible. But the probability is that with this man having no symptoms whatsoever and he wakes up with these symptoms, something had to have happened during this short period of time [while he was anesthetized]....
Q. Would this be [the] type of injury that would ordinarily not occur unless somebody during the operative procedure did something which was below the | ^applicable standard of care? In other words, if everything is done right, this injury would not have occurred?
A. Yes.
Q. Conversely, if something was done wrong, there would be a high probability that this injury would occur?
A. Yes. (Our brackets.)
Dr. Kline, who did not examine or treat Robertson, agreed with Dr. Stringer that Robertson’s injury probably occurred during the abdominal surgery, but opined, from his review of the hospital records and depositions, that no malpractice occurred and that Robertson was simply predisposed to an ulnar nerve injury from the normal events of surgery by one or more anatomical, medical or occupational factors.
Drs. Wapenski and Stringer effectively ruled out the first two possible predisposing factors in their respective tests and treatment of Robertson. Even Dr. Kline testified that he could not identify Robertson’s work as a “definite” predisposing factor.
CONCLUSION
The jury was effectively told, on the one hand, that Robertson was not predisposed to an ulnar nerve injury before his abdominal surgery and that the injury was, more probably than not, caused by substandard medical care. Defendants, on the other hand, effectively told the jury that the standard of care was met in all respects and that Robertson was, more probably than not, predisposed to an ulnar nerve injury from the normal events of surgery, by factors which were not clearly identified, even by the defense experts.
We review the appellate record in the light that most favorably supports the judgment. On this record, we cannot say the jury was clearly wrong in weighing the | ^evidence and assessing credibility, finding Robertson’s nerve injury was, more probably than not, caused by substandard medical care on the part of each of the three defendants, in percentages that reflect the corresponding differences in their respective duties to prevent this type of injury. We find no error or abuse of discretion in the jury’s allocation of fault.
The trial court’s refusing to instruct the jury on res ipsa loquitur does not mandate a different result. See and compare Martin v. East Jefferson General Hosp., supra, and Roark v. St. Paul Fire & Marine Ins. Co., 415 So.2d 295 (La.App. 2d Cir.1982), writ denied.
DECREE
At the cost of the defendants, the judgment is AFFIRMED.