775 So.2d 1175 (2000)
Bethel STRODER, Plaintiff-Appellant,
v.
Dr. Marc HOROWITZ, et al., Defendant-Appellees.
No. 34,048-CA.
Court of Appeal of Louisiana, Second Circuit.
December 20, 2000.
*1176 Richard L. Fewell, Jr., Counsel for Appellant.
Onebane, Bernard, Torian, Diaz, McNamara & Abell, by William E. Bourgeois, Counsel for Appellee.
Before WILLIAMS, GASKINS, CARAWAY, PEATROSS & DREW, JJ.
PEATROSS, J.
This appeal arises from the granting of a motion for summary judgment in favor of Defendants, Dr. Marc Horowitz, Dr. Thomas C. Wooldridge and Morehouse General Hospital, dismissing the medical malpractice suit filed against them by *1177 Plaintiff, Bethel Stroder. For the reasons stated herein, we reverse and remand.

FACTS
At approximately 5:30 p.m., on October 14, 1995, Ms. Stroder was taken via ambulance from her home in Oak Grove, Louisiana, to Morehouse General Hospital ("Morehouse") for severe abdominal pains. The testimony of Ms. Stroder's family members indicates that she asked to be taken to E. A. Conway Hospital ("Conway"), the charity hospital in Monroe, Louisiana. She apparently, however, lost consciousness in the ambulance; and the driver made the unilateral decision to stop at Morehouse, which was closer.
Ms. Stroder arrived at the emergency room of Morehouse and was admitted by 6:08 p.m. She was examined by Dr. Horowitz who was the emergency room physician working that evening. The examination revealed a hard, ten centimeter round mass in the left lower quadrant of Ms. Stroder's abdomen and an absence of bowel sounds. Dr. Horowitz suspected Ms. Stroder was suffering from a strangulated hernia and ordered further testing.[1] Ms. Stroder's hematology and blood gas test results were finished by 6:40 p.m. The tests revealed an increased white blood cell count, indicative of infection; an elevated glucose level; and an elevated blood pH.[2] A portable chest x-ray was also taken with Ms. Stroder in the supine position, which revealed no sign of free, air under the diaphragm. The test results confirmed Dr. Horowitz's suspicion of a strangulated hernia, which required immediate surgery.
Dr. Wooldridge was the on-call surgeon at Morehouse that evening. Although Dr. Horowitz does not recall the exact moment Dr. Wooldridge was paged for a surgical consultation concerning Ms. Stroder, he and the emergency room nurses who were on staff that evening testified that Dr. Wooldridge came to the emergency room, read Ms. Stroder's chart, refused to examine her and recommended that an NG tube[3] be inserted and that she be transferred to Conway. Dr. Wooldridge testified that he has no independent recollection of that event, and his alleged consultation is not documented in Ms. Stroder's chart.
Dr. Horowitz then contacted Dr. Daniel Martinez, a general surgeon at Conway, to arrange for the transfer of Ms. Stroder. Based on her vital signs as related to him by Dr. Horowitz by telephone, Dr. Martinez testified that he considered Ms. Stroder's condition to be stable at the time of transfer; and, had she not been stable, he would have refused the transfer. Dr. Martinez further testified that, in his position, he accepts the transfer of most all patients unless they are "crashing or coding," meaning their blood pressure has dropped considerably or they are dying.
Ms. Stroder was transferred from Morehouse at approximately 8:30 p.m. and arrived at Conway at approximately 9:00 p.m. Following her arrival at Conway, Dr. Martinez ordered another chest x-ray of Ms. Stroder to check for free air in the *1178 abdominal cavity which would indicate that the bowel had deteriorated to the point of perforation. The supine x-ray showed no free air. Dr. Martinez then ordered that a chest x-ray be taken with Ms. Stroder in an upright position. This x-ray indicated that there was free air in Ms. Stroder's abdominal cavity. Dr. Martinez confirmed Dr. Horowitz's diagnosis of a strangulated or incarcerated hernia which had, at that point, caused the bowel to perforate. Ms. Stroder had become dehydrated by this point, however, and had to be re-hydrated before she could undergo anesthesia and surgery. At approximately 2:45 a.m., Dr. Martinez performed a laparotomy with resection of the perforated small bowel and lysis of adhesions.
Ms. Stroder complains that the delay in surgery caused by the transfer to Conway caused the perforation of her bowel, resulting in a longer recovery time, the necessity of assistance from family and friends in caring for herself, tremendous pain and discomfort and the need for further surgeries to remove the adhesions (scar tissue caused by the release of gastric fluid into the abdominal cavity).
Ms. Stroder filed a complaint against Dr. Horowitz and Morehouse on June 10, 1996. On August 12, 1996, Ms. Stroder filed an amended complaint adding Dr. Wooldridge as a defendant. Ms. Stroder alleged malpractice for failure to properly treat her, as well as a violation of the "anti-dumping legislation."[4] A medical review panel was convened and, on June 11, 1997, rendered its expert opinion stating that the standard of care had not been breached and medical malpractice had not been committed. All defendants filed motions for summary judgment which were granted in their favor by the trial court.

DISCUSSION

Summary Judgment
A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to a material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966; Mixon v. Progressive Specialty Co., 29,698 (La.App.2d Cir.6/18/97), 697 So.2d 662. If the court finds that a genuine issue of material fact indeed exists, summary judgment must be denied. Truelove v. Bissic, 32,883 (La. App.2d Cir.3/1/00), 754 So.2d 377, writ denied, XXXX-XXXX (La.5/26/00), 762 So.2d 1109.
The party seeking summary judgment has the burden of affirmatively showing the absence of a genuine issue of material fact. A fact is material if its existence or nonexistence may be essential to the plaintiffs cause of action under the applicable theory of recovery. Hardy v. Bowie, 98-2821 (La.9/8/99), 744 So.2d 606; Barnett v. Staats, 25,357 (La.App.2d Cir.1/19/94), 631 So.2d 84. Questions of negligence are generally inappropriate for disposition by summary judgment. Mixon v. Davis, 31,725 (La.App.2d Cir.3/31/99), 732 So.2d 628; Banks v. State Farm Insurance Company, 30,868 (La.App.2d Cir.8/19/98), 717 So.2d 687.
Appellate courts are to conduct a de novo review of the documentation supporting and opposing summary judgment under the same criteria which govern the trial court's determination of whether summary judgment is appropriate. Fuggins v. Burger King, 33,473 (La.App.2d Cir.5/10/00), 760 So.2d 605.
In the case sub judice, Defendants, as the moving parties, contend that there are no material issues of fact, particularly since the medical review panel did not find that any party had deviated from the standard of care. We find, however, that there *1179 are genuine issues of material fact pertaining to each of the Defendants.

Applicable law
To prevail in a medical malpractice action against a physician, the plaintiff must establish that the doctor's treatment fell below the ordinary standard of care expected of a physician in his medical speciality, and also that a causal relationship existed between the alleged negligent treatment and the injury sustained. La. R.S. 9:2794; Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272 (La.1991); Smith v. State, through DHHR, 523 So.2d 815 (La. 1988); Warren v. Everist, 30,187 (La. App.2d Cir.1/21/98), 706 So.2d 593, writ denied, 98-0477 (La.4/03/98), 717 So.2d 1132. A hospital is responsible for the negligence of its employees under the doctrine of respondeat superior. Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991). Under this theory, the standard of care and burden of proof involved is the same as for the physician whose activities are questioned. Corley v. State, Dept. of Health & Hospitals, 32,613 (La.App.2d Cir.12/30/99), 749 So.2d 926; McCraw v. Louisiana State University Medical Center, 627 So.2d 767 (La. App. 2d Cir.1993), writ denied, 94-0001 (La.3/11/94), 634 So.2d 399; Bolton v. Louisiana State University Medical Center, 601 So.2d 677 (La.App. 2d Cir.1992).

Dr. Marc Horowitz and Dr. Thomas C. Wooldridge
It is not disputed that Dr. Horowitz correctly diagnosed Ms. Stroder's condition; nor is it disputed that surgery was necessary to correct Ms. Stroder's condition. Rather, the dispute arises relative to whether Dr. Horowitz, who is not a surgeon, sought an appropriate surgical consultation.
According to his testimony, Dr. Horowitz initially attempted to arrange a surgical consultation for Ms. Stroder with Dr. Wooldridge. As previously stated, it was the testimony of Dr. Horowitz and the two emergency room nurses that Dr. Wooldridge did come to the emergency room in response to a page from Dr. Horowitz regarding Ms. Stroder, but that he refused to actually examine. Ms. Stroder.[5] According to the testimony of the emergency room nurses and Dr. Horowitz, Dr. Wooldridge reviewed Ms. Stroder's chart, lab reports and x-rays. Again, according to that testimony, Dr. Wooldridge then suggested that she was stable and should be transferred to Conway for the surgical procedure.
Ms. Stroder's medical records from Morehouse, however, do not contain any notation concerning, or by, Dr. Wooldridge. As previously stated, he testified that he has no independent recollection of the events and can only assume that, because there is no notation in the chart, he must not have been called. It is disputed, therefore, whether or not Dr. Horowitz called Dr. Wooldridge for a surgical consultation regarding Ms. Stroder's condition. Both Dr. Horowitz and Ms. Stroder's expert, Dr. Paul von Ryall Gryska, stated that it would be a breach of the standard of care for Dr. Horowitz to fail to seek a surgical consultation once he determined that Ms. Stroder did indeed need surgery. Although Dr. Gryska opined in his deposition that Dr. Horowitz's actions did not fall below the standard of care, his opinion was based on his acceptance as fact that Dr. Horowitz did consult with Dr. Wooldridge and that Dr. Wooldridge approved *1180 the transfer of Ms. Stroder. Whether or not Dr. Horowitz sought a surgical consultation with Dr. Wooldridge is, however, a material issue of fact, making summary judgment inappropriate.[6]
Dr. Horowitz contends that, even if it is determined that Dr. Wooldridge was never paged, he sought a surgical consultation with Dr. Martinez when he spoke to him about transferring Ms. Stroder to Conway. Dr. Gryska, however, testified that it is important in a surgical evaluation to actually "eyeball" or see and touch a patient to give a proper assessment. He stated that the stability of a patient cannot be assessed without actually being there. In addition, and as previously stated, Dr. Martinez testified that, in his position as a charity hospital surgeon, he accepts most all transfer patients and considers them as "stable" for transfer, unless they are "crashing or coding" at the moment of transfer, i.e. considerable loss of blood pressure or cardiac arrest. It is factually disputed, therefore, whether Ms. Stroder was stable for transfer or was in an emergent state that required immediate surgery. There is also conflicting evidence as to when Ms. Stroder's bowel perforated and whether her transfer delayed surgery to the point that her bowel did perforate.[7]
According to Dr. Gryska, the tissue of the bowel will eventually perforate due to the lack of oxygen, allowing the contaminated gastric contents to flow into the abdominal cavity causing the body to react in defense. At 6:40 p.m., Ms. Stroder's chart showed that her blood pH was 7.55, with the normal range being between 7.35 and 7.45.[8] Further, according to Dr. Gryska's testimony, Ms. Stroder's white blood cell count was very high, indicating that her body was marshaling its forces to fight an infection which may have been the result of perforation of the bowel. Dr. Gryska also testified that Ms. Stroder's elevated glucose may have been indicative of a perforation. Ms. Stroder was a medically controlled diabetic, meaning she took medicine on a daily basis to control her glucose level. The normal range for glucose is 75 to 110, with a safe ceiling of 300; and Ms. Stroder's glucose was at 340, despite the fact that she was taking medication. The question is, was she, in fact, stable enough for transfer to Conway? In Dr. Gryska's opinion, he would not have transferred her because she was "dreadfully ill." In addition, there is a material issue of fact as to whether or not Dr. Horowitz related all of this pertinent information to Dr. Martinez.[9] Only a portion of Dr. Martinez's deposition is contained in the record. We cannot, therefore, make this determination and this issue of material fact should be decided by the trier of fact.

*1181 Morehouse

Finally, there are at least two issues of material fact concerning liability on the part of Morehouse. First, there is little or no evidence regarding Dr. Horowitz's or Dr. Wooldridge's relationship with Morehouse. None of the parties adduced sufficient evidence which would indicate whether Dr. Horowitz or Dr. Wooldridge were employees of Morehouse or independent contractors, making this a question of material fact.
Whether a physician is an employee or an independent contractor is a factual issue turning on the control exercised by the hospital over his activities. Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986); Suhor v. Medina, 421 So.2d 271 (La.App. 4th Cir. 1982). The existence of an independent contractor agreement is not necessarily dispositive of the issue of whether a doctor is an independent contractor, as opposed to an employee of a hospital, and courts will inquire as to the real nature of the relationship and the degree of control exercised or ability of control by the hospital over the doctor's activities. Prater v. Porter, 98-1481 (La.App. 3d Cir.1999), 737 So.2d 102; Suhor, supra.
Second, there is the question of whether Morehouse had an unspoken policy of not treating indigent patients, in violation of the federal anti-dumping statute, 42 U.S.C.A. § 1395dd. The statute states, in pertinent part, as follows:
(a) Medical screening requirement
In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

(b) Necessary stabilizing treatment for emergency medical conditions and labor
(1) In general
If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either
(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.
* * * * * *
(c) Restricting transfers until individual stabilized
(1) Rule
If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual
(Emphasis Added).
Dr. Horowitz testified that he had noticed on several occasions that some of the on-call physicians would not see his patients if they did not have insurance. He further testified that he complained to the emergency room charge nurse, Bonnie Gilmore, who verified his suspicions. According to Dr. Horowitz, Nurse Gilmore informed him on several occasions that it was an unspoken policy that Morehouse would not take a financial risk on an indigent patient, but would instead transfer that patient to the charity hospital. In her testimony, *1182 however, Nurse Gilmore denied that Morehouse had such a policy or that she ever had such a conversation with Dr. Horowitz.
Again, we are faced with conflicting evidence concerning a material fact, i.e., whether Morehouse had a policy of refusing treatment to indigent patients. More important, however, is the question of whether Ms. Stroder was stable when she was transferred from Morehouse to Conway.

Summary
In summary, there are factual disputes pertaining to each defendant which we find involve material issues. Each of the facts discussed above is essential to Ms. Stroder's cause of action. Hardy v. Bowie, supra; Barnett v. Staats, supra. Since we find that Defendants failed to affirmatively show otherwise, summary judgment should not have been granted.

CONCLUSION
For the foregoing reasons, the judgment of the trial court granting the motions for summary judgment on behalf of Defendants, Dr. Marc Horowitz, Dr. Thomas C. Wooldridge and Morehouse General Hospital, is reversed. Costs are assessed equally to Defendants, Dr. Marc Horowitz, Dr. Thomas C. Wooldridge and Morehouse General Hospital.
REVERSED AND REMANDED.
GASKINS, J., concurs in part and dissents in part.
GASKINS, J., concurring in part and dissenting in part.
I respectfully concur with the majority that the summary judgment on behalf of Dr. Wooldridge and Morehouse General Hospital should be reversed and dissent as to the majority's reversing the summary judgment on behalf of Dr. Horowitz.
NOTES
[1] Ms. Stroder suffered from a hernia in her abdominal wall. A portion of her small intestine, or bowel, worked its way through the hernia and outside of the abdominal cavity, thus creating the mass which Dr. Horowitz discovered. This resulted in a restriction of the blood flow to that portion of the bowel which had passed through the hernia. The tissue will ultimately die from the lack of oxygen. The ramification if this is not corrected is the breakdown of the tissue to the point that it allows seepage of the bowel contents into the abdominal cavity which is referred to as perforation of the bowel.
[2] "pH" is a chemical measurement relating to the alkaline or acid content of a given solution. A pH of 7 is neutral, above 7 is alkaline and below 7 is acidic.
[3] This is a nasogastric tube which is placed into the stomach via the nasal cavity. Suction is used to remove excessive gastric contents when digestion is hindered. This helps to alleviate nausea and discomfort.
[4] The federal government has enacted a statute which prohibits the transfer of indigent patients from a paying hospital to a charity hospital if they are in an emergent state. 42 U.S.C.A. § 1395dd.
[5] Dr. Horowitz testified that he had frequently experienced difficulty obtaining consultations from the on-call specialists for patients who did not have insurance. Ms. Stroder did not have insurance and her chart indicated this fact. Dr. Horowitz further testified that he had paged Dr. Wooldridge earlier in the evening for a surgical consultation for another patient who did not have insurance and Dr. Wooldridge did not respond at all.

When specifically asked in his deposition whether he believed he had a duty to go to the emergency room in response to a request from another physician to see a patient with an acute surgical problem, Dr. Wooldridge replied, "not necessarily."
[6] In his brief at page 11, Dr. Horowitz concedes that there are disputed facts regarding "... whether or not Dr. Horowitz obtained a surgical consult from Dr. Wooldridge while Ms. Stroder was at Morehouse General Hospital."
[7] Ms. Stroder was picked up by ambulance from her home at approximately 5:30 p.m. on October 14, suffering from severe abdominal pain. She did not undergo surgery, however, until approximately 2:45 a.m. October 15. Dr. Gryska testified in his deposition to the importance of the timing when a surgeon is dealing with an intestinal injury. In his opinion, the timing, which directly correlates to the amount of contamination which occurs in the abdomen, is very important and affects the extent of a person's ultimate injury and recovery.
[8] Dr. Gryska testified at page 311 of the record that Ms. Stroder's blood pH, as he recalled it, was 7.47. The medical record from Morehouse, however, indicates that her blood pH was actually 7.547. See page 344 of the record.
[9] Dr. Gryska testified that, had Dr. Wooldridge, as a surgeon, been the one to speak with Dr. Martinez, another surgeon, Ms. Stroder may have gotten to the operating room faster. Dr. Gryska testified that he fervently believes that, in the case of transfer, a surgeon-to-surgeon conversation, as opposed to a general practitioner-to-surgeon conversation, would have better conveyed how truly ill Ms. Stroder was and would have facilitated more immediate care.